614 A.2d 1116

**OFFICE OF DISCIPLINARY COUNSEL, Petitioner,**

v.

**Michael E. DAVIS, Respondent.**

Supreme Court of Pennsylvania.

Argued Jan. 23, 1992.

Decided Sept. 16, 1992.

Michael E. Davis, for respondent.

Samuel F. Napoli, Robert Davis, Jr., for Office of Disciplinary Counsel.

Before NIX, C.J., and FLAHERTY, McDERMOTT, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

PAPADAKOS *, Justice.

The disciplinary matter under review here encompasses two petitions for discipline filed by the Office of Disciplinary Counsel (ODC) charging Respondent with violations of the Code of Professional Responsibility for conduct which occurred in 1982–1983.

The first petition was filed on October 5, 1987, and docketed at No. 74 DB 87. Respondent was charged there with numerous Code violations involving improper venue in divorce cases for purposes of obtaining lower filing costs in his representation of Mrs. Michelle A. Dietrich and Mrs. Deborah R. Wescott.

A second petition was filed on February 12, 1988, and docketed at No. 12 DB 88. These charges of misconduct involved Respondent's failure to return master fees in divorce cases in Lancaster County and commingling of funds. This misconduct also took place in 1982 and 1983.

A Hearing Committee considered both petitions, found that Respondent had committed serious breeches of discipline, and also taking into account his numerous other violations, recommends disbarment. By contrast, the Disciplinary Board, while deciding that several Code rules had been broken, recommends suspension for six months to run concurrently with his last suspension dated January 18, 1985. Disciplinary Counsel urges us to reject the report of the Disciplinary Board in favor of the Hearing Committee's findings and disbar Respondent. For reasons listed below, we agree with the Hearing Commit-

* Reassigned to this writer.

tee and Disciplinary Counsel that disbarment is fully warranted in this case.

It is important to note that at present Respondent remains suspended from the practice of law pursuant to our order dated May 21, 1984, for other disciplinary violations.[1]

## I. Factual and Procedural History

### A. No. 74 DB 87

#### Charge I: Mrs. Dietrich

Following passage of the new Divorce Code in 1980,[2] Respondent advertised widely his low cost services for "No Fault" actions. It appears that he began accepting an average of over 100 cases per week. All of these cases were filed in Allegheny County regardless of the client's residence. Because of the large number of non-resident cases filed there, court officials insisted on strict enforcement of venue requirements. Respondent then began filing non-resident cases in Cameron County which charged the lowest filing fee for non-residents. On April 23, 1982, we ordered all president judges to observe the requirements of Pa.R.C.P. 1920.3 which provides that divorce actions must be brought only in the county where either the plaintiff or defendant resides.[3]

Respondent had undertaken representation of Mrs. Dietrich prior to our order of 1982 and planned to file in Cameron County. Following the order, however, he indicated to his client that he could not file in Cameron County. Mrs. Dietrich, whose permanent address was really Montgomery County, then told Respondent that she lived in Philadelphia with her aunt and that Montgomery County, which address appeared on correspondence with Respondent, was a temporary

1. Respondent was suspended three times by this Court: on May 21, 1984 (six months); on September 7, 1984 (one year, consecutive); and on February 28, 1985 (six months, consecutive). He has also been subject to twenty-three informal admonitions, of which all but one were administered in 1982 and 1983. Respondent has not applied for reinstatement pending resolution of the instant complaints.

2. Act of 1980, April 2, P.L. 63, No. 26, 23 P.S. § 101, et seq.

3. As amended in 1989, the rule presently permits that a divorce action also may be brought in any county agreed upon by the parties.

college address. Mrs. Dietrich filed the divorce complaint in Philadelphia. The court there, however, requested an affidavit for the Philadelphia address, and Respondent sent her the affidavit which she signed and which was presented in support of the Philadelphia domicile. At the scheduled hearing, which Mrs. Dietrich attended alone because she refused to pay additional attorney fees, the court confronted her with records from the Department of Welfare indicating that her permanent address was Montgomery County. Mrs. Dietrich then admitted that she lived in Montgomery County to where the divorce action was transferred for disposition.

The issue for our review is whether Respondent knew that Mrs. Dietrich lived in Montgomery County but counseled her to file in Philadelphia where fees were lower and sent a supporting affidavit which she signed affirming her status as a resident of Philadelphia.

The following relevant considerations also are taken into account in evaluating this issue. First, Respondent was aware that Mrs. Dietrich, and almost simultaneously Mrs. Westcott for that matter, was seeking to file her action in a county with the lowest costs. Secondly, once Mrs. Dietrich learned from Respondent that Philadelphia's fees were lower, she told him that she, in fact, lived in Philadelphia, and Respondent acted on this designation of her address by having her file a complaint and affidavit with the court in Philadelphia even though he had corresponded with her at the Montgomery County address.

As to the charges involving Mrs. Dietrich, Respondent has steadfastly denied that he ever counseled her to use the fictitious Philadelphia address in filing her complaint there. He insists that he inadvertently believed that the Montgomery County address was being used by his client as a mere convenience for receiving mail while he accepted her statement that she was a resident of Philadelphia. Any discrepancies on this matter were due to poor office management brought about by inexperience, failure to supervise his office staff properly, and most importantly the crush of a burgeoning

caseload which forced him to work long hours for seven days per week.

These factors, he argues, led to specific filings which were not intentional on his part. The file jacket for Mrs. Dietrich's case, for example, lacked any notation that her Montgomery address "was merely a school address," as he testified in his defense (H.C.T., p. 54), while failures to investigate further were traceable to sloppy business procedure and secretarial mismanagement.[4]

On this basis, the Hearing Committee concluded that Respondent had committed the following violations of the Disciplinary Rules:

DR 7-102(A)(6): participation in the creation of evidence which he knew was false;

DR 7-102(A)(5): conduct prejudicial to the administration of justice in filing the complaint and affidavit upon statements of fact which he knew to be false;

DR 7-102(A)(7): counseling a client in conduct he knew to be illegal and fraudulent;

DR 7-102(A)(5): advising his client to make a false affidavit, constituting conduct prejudicial to the administration of justice;

DR 1-102(A)(4): conduct involving dishonesty, fraud, or misrepresentation;

DR 1-102(A)(6): conduct reflecting adversely upon a lawyer's fitness to practice law.

The Committee's analysis found that Mrs. Dietrich was an "unsophisticated and unlearned person" who could not have decided to file in Philadelphia "unless she was advised by

---

4. Respondent raised the doctrine of laches in his defense. The Disciplinary Board initially remanded the matter back to the Hearing Committee to consider the question of laches arising from the time lapse between the alleged misconduct in 1982 and the filing of the Petitions for Discipline in 1987 and 1988. The Hearing Committee determined that laches was not an issue, and reasserted its recommendation that Respondent be disbarred. The Board accepted this recommendation as to laches. We agree that the defense of laches is not applicable as Respondent contributed to the delay and has not demonstrated the requisite prejudice arising from such delay.

Respondent." In sum, the Committee believed that Respondent was the initiator and perpetrator of fraud on the court in relationship to the use of the fictitious address in Philadelphia. Respondent also could not be believed because he should "have examined Dietrich very closely" when the Philadelphia court requested an affidavit for residency. Furthermore, "such conduct was a pattern and not simply an isolated error of judgment." The Committee took special note of the fact that Mrs. Dietrich's file jacket had a Montgomery County address without any notation that it was merely a college address.

The Disciplinary Board, on the other hand, arrived at somewhat different conclusions. Although Mrs. Dietrich appeared unsophisticated, "we are convinced that she was astute enough to understand that if she lived in Philadelphia, the divorce . . . would be cheaper" (D.B.Rpt., p. 19). On the issue of whether Respondent knew that the Philadelphia address was fictitious, the Board's report appears contradictory. The report (at p. 9) first concludes: "Given the circumstances surrounding this case, Respondent knew or should have known that Mrs. Dietrich did not live in Philadelphia and that the Court of Common Pleas of Philadelphia County did not have proper venue in this matter." At p. 19, however, the report states: "We believe that the Respondent filed the divorce complaint without knowing or having reason to know that Mrs. Dietrich's Philadelphia address was false."

The Board went on to conclude that Respondent is guilty of ignoring "warning signals," such as two addresses and the request for an affidavit. These, however, in the Board's view were due to Respondent's inexperience and practice of law "like a mail order business." The Board, nevertheless, found that in Mrs. Dietrich's case, Respondent did violate DR 7-102(A)(6), participating in the creation of evidence (the affidavit) and DR 1-102(A)(6), conduct adversely reflecting on fitness to practice (the affidavit). The Board held, nevertheless, that it was "not convinced that his misconduct rises to the level of an intentional act" (D.B.Rpt., p. 20).

A critical piece of evidence before the Hearing Committee and the Disciplinary Board was the testimony of Mrs. Dietrich that Respondent knew of and advised her to use the fictitious Philadelphia address. Mrs. Dietrich did not appear personally before the Hearing Committee; the Office of Disciplinary Counsel offered a stipulation that "Michael Davis told me to use my aunt's address in Philadelphia." Respondent stipulated as to how she would testify without stipulating that the unsworn statement was true but accepted its admissibility without the right of cross-examination.

The Hearing Committee report does not address the issue, but the Disciplinary Board concluded that "the stipulation is not credible" (at p. 18). Additionally, the Board found that Mrs. Dietrich lied about her address before the court in Philadelphia, a falsity which, in the Board's view, casts suspicion on all of her testimony.

### Charge II: Mrs. Wescott

Similar to the prior case and almost parallel in time, Mrs. Westcott, a resident of Montgomery County, retained Respondent to represent her in a divorce action. Respondent informed her that he was barred from filing in Cameron County. A great deal of confusion followed. Mrs. Wescott fired Respondent, then rehired him; correspondence was missing, and her file could not be located; and there was a refund and repayment of fees. Except that they reveal once again poor office management, these factors are not pertinent to the issue at hand. The issue arises from the two facts that Mrs. Wescott told him that she lived at an address in Bucks County where he should file the complaint, and that she accused Respondent in the same stipulation of the Dietrich hearing of knowledge that the Bucks County address was false, but he still counseled her to use the fictitious address. We note that Respondent did not file a complaint in divorce for Mrs. Westcott in Bucks County or anywhere else prior to terminating his representation of this client.

The issues of this charge, therefore, are whether Respondent ever counseled Mrs. Westcott to use a fictitious address

and whether his incredibly disorganized handling of her file led him to be neglectful in investigating the residency question.

The Hearing Committee determined that Respondent violated DR 7–102(A)(7) and DR 1–102(A)(4). The Disciplinary Board found no violations.

## B. No. 12 DB 88

The facts indicate that between 1982 and 1984, Respondent represented seven clients in divorce actions in Lancaster County. During this period, Lancaster County required such plaintiffs to pay a master fee of $50.00, refundable if the master was not employed in the case. Upon praecipe by Respondent, the fees paid by these clients were returned because a master was not used. The problem in this case arises because Respondent deposited them in the account of his partner, marked "Howard R. Singer Special Account" and failed to notify the clients that the money had been returned after he had closed representation. In September, 1986, after receiving an inquiry from the Office of Disciplinary Counsel regarding the fees, Respondent checked personally with Lancaster County officials to determine whether the fees had been returned and then refunded the proper amount to each client.

The Hearing Committee found that Respondent committed the following Code violations:

DR 9–102(A): commingling of funds;

DR 9–102(B)(1): failure to notify clients promptly of the return of funds;

DR 2–110(A)(2): failure to deliver client property upon cessation of representation;

DR 1–102(A)(6): conduct reflecting adversely on fitness to practice law.

The Disciplinary Board rejected the Hearing Committee's findings as to each Code violation either as being inapplicable under the facts or unsubstantiated by facts. Regarding the charge of commingling, the Board determined that Respondent's conduct, while the product of "ignorance," was not

intentional. Respondent had admitted in testimony that he was not aware of a rule against commingling of funds. (D.B. Rpt., p. 22; Respondent's admission of "ignorance" of the commingling rule appeared in the Board's report at p. 13). The Board concluded further that all aspects of the problem of the master fees again was attributable to the fact that Respondent "did not seem to understand that practicing law is different than (sic) running other businesses." (*Id.*, p. 23).

## II. Analysis and Conclusion

The history of this case presents us with starkly contrasting conclusions regarding the charges of Code violations brought against Respondent. Our de novo review convinces us that the analyses and recommendations of the Hearing Committee are correct.

First, we find that he had knowledge that both Mrs. Dietrich and Mrs. Westcott were filing divorce complaints in courts of improper venue but advised them to proceed. In the former's case, we take particular note of the affidavit he forwarded to the Court of Common Pleas in Philadelphia. In both cases, it would strain logic to presume that these clients would have had knowledge of lower court costs without prompting by a lawyer. The identical patterns of conduct in two parallel cases, moreover, creates an unmistakable pattern of intentional fraud on the courts of this Commonwealth. Mrs. Dietrich's false testimony before the Philadelphia court was the product of his advice.

■■ On the issue of commingling, the Disciplinary Board determined that Respondent did not act intentionally to conceal the funds. DR 9–102(A) contains no requirement of an intentional act, but rather provides for strict liability.[5] We

---

5. The Board cites to *Office of Disciplinary Counsel v. Lucarini*, 504 Pa. 271, 472 A.2d 186 (1983), and *Office of Disciplinary Counsel v. Knepp*, 497 Pa. 396, 441 A.2d 1197 (1982), for the proposition that so far, at least, we have interpreted DR 9–102(A) to require an intent to convert commingled funds. Those cases merely address the Code violation in factual circumstances where an intent to convert was present.
   DR 9–102 **Preserving Identity of Funds and Property of a Client** (A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more

would be remiss at this point if also we did not reject out of hand the Board's curious suggestion that Respondent's ignorance of professional rules constitutes an excuse for his conduct.

■ Although neither Mrs. Dietrich nor Mrs. Wescott appeared before the Hearing Committee, the surrounding circumstances of their actions convince us that Respondent knowingly and intentionally guided their actions. In disciplinary cases, our standard of review is de novo, and we are not bound by the findings of the Hearing Committee or the Disciplinary Board, except as guidelines for judging credibility of witnesses. Deference must be given to the former as the trier who views the witnesses, *Office of Disciplinary Counsel v. Campbell,* 463 Pa. 472, 345 A.2d 616 (1975), as well as to the recommendations of the Board, *Office of Disciplinary Counsel v. Costigan,* 526 Pa. 16, 584 A.2d 296 (1990). Also see, *Office of Disciplinary Counsel v. Kissel,* 497 Pa. 467, 442 A.2d 217 (1982). While we require a preponderance of competent evidence which must have a persuasive influence, unprofessional conduct may be proven solely by circumstantial evidence. *In re Berlant,* 458 Pa. 439, 328 A.2d 471 (1974); *Office of Disci-*

identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:

(1) Funds reasonably sufficient to pay bank charges may be deposited therein.

(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.

(B) A lawyer shall:

(1) Promptly notify a client of the receipt of his funds, securities, or other properties.

(2) Identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable.

(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.

(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.

*plinary Counsel v. Grigsby,* 493 Pa. 194, 425 A.2d 730 (1981). Lastly, we give weight to the horrendous disciplinary record compiled by Respondent. See, *Grigsby,* 493 Pa. at 200, 425 A.2d 730 ("Respondent's record of repeated disciplinary violations cannot be ignored").

Disbarment is the most serious form of disciplinary discipline. Pa. Rule of Disciplinary Enforcement 204(a)(1); *Matter of Leopold,* 469 Pa. 384, 366 A.2d 227 (1976). It is our responsibility, nevertheless, to protect the public and preserve public confidence in the legal profession and the judicial system, *Office of Disciplinary Counsel v. Lewis,* 493 Pa. 519, 426 A.2d 1138 (1981), even though we must proceed with due caution. *E.g., In re Shigon,* 462 Pa. 1, 329 A.2d 235 (1974).

■■■ A pattern of misconduct, including neglect of legal matters, counseling clients to undertake dishonest acts in court proceedings, deceitful use of an affidavit, and commingling of entrusted funds, warrant disbarment. See, *Office of Disciplinary Counsel v. Knepp,* 497 Pa. 396, 441 A.2d 1197 (1982); *Office of Disciplinary Counsel v. Ewing,* 496 Pa. 35, 436 A.2d 139 (1981); and *Office of Disciplinary Counsel v. Herman,* 493 Pa. 267, 426 A.2d 101 (1981). Even if we were to view Respondent's office mismanagement as a mitigating factor, which we do not, the sanction would remain the same. See, *Knepp.*

Our last duty is to address the issue of whether Respondent's misconduct should be overlooked because of his grossly inept and amateurish attempt to practice law in the face of an overwhelming case load. Respondent, and the Disciplinary Board, admitting that he should have uncovered the problems of improper venue and commingling had he not ignored warning signals, urge us to find that his careless office procedure prevented him from doing so, and that this is a valid defense. According to this view, what he should have known as a lawyer, but did not, is excusable because of the nature of his practice as a lawyer. His conduct, under this theory of the case, thereby was neglectful but not intentional.

We are not prone to accept arguments which stand professional responsibility on its head. Respondent's office practice may be an explanation, but certainly it is not a justification. The fact is that he knowingly and intentionally accepted a volume of cases far beyond his capacity to deal with. It is also a fact that he found no reason to familiarize himself with the rules of conduct for lawyers. Such knowing and intentional acts formed the predicate for his conduct in the cases under review. Between his deliberate decision to practice in this fashion and the instant citations of misconduct, there exists a causal link that any first-year law student would have foreseen or corrected. As he sowed intentionally, so did he reap the consequences. To have it otherwise would put the legal profession and the judiciary in the position of justifying misconduct resulting from abhorrent office procedure and lack of discipline.

Accordingly, the Rule to Show Cause is made absolute and Respondent, Michael E. Davis, is hereby disbarred, effective May 21, 1986.

LARSEN and ZAPPALA, JJ., did not participate in the consideration or decision of this case.

CAPPY, J., files a Dissenting Opinion.

McDERMOTT, J., did not participate in the decision of this case.

CAPPY, Justice, dissenting.

I respectfully dissent. This Court, in response to the report and recommendation filed in this matter on October 9, 1990, by the Disciplinary Board, issued a rule upon respondent, Michael E. Davis to show cause why he should not be disbarred from the practice of law in the Commonwealth of Pennsylvania. I would discharge the rule to show cause and order Davis suspended from the practice of law effective May 21, 1986, for a period of time equal to that which he has already served.

The disciplinary matter before this Court was commenced by two separate petitions for discipline filed by the Office of

Disciplinary Counsel (ODC), charging Davis with numerous violations of the provisions of the disciplinary rules of the Code of Professional Responsibility. On October 5, 1987, ODC filed its petition, docketed No. 74 DB 87, accusing Davis of neglect and of counseling two unrelated clients to misrepresent their counties of residence in order to circumvent venue requirements, thus reducing the costs associated with their divorces. It also accused Davis of participating in the creation and preservation of evidence that he knew was false. On February 2, 1988, ODC filed its petition, docketed No. 12 DB 88, accusing Davis of improperly handling master's fee refunds in seven divorce actions in Lancaster County.

Both matters were referred to a Hearing Committee. At the hearing, ODC presented no witnesses, and only Davis testified on his behalf. On August 3, 1989, the Hearing Committee issued its report, finding Davis intentionally violated numerous disciplinary rules, and recommending that Davis be disbarred. Oral argument was subsequently held before the Board pursuant to Pa.R.D.E. 208(d). On October 9, 1990, the Board issued its report, finding Davis did not intentionally violate the disciplinary rules, and recommending that Davis be suspended from the practice of law for six months to run concurrent with a prior suspension imposed at No. 78 DB 82 by order of this Court dated February 28, 1985.[1]

This matter was then referred to the attention of this Court for review and action pursuant to Pa.R.D.E. 208(e). Due to the great variance between the recommendations of the Hearing Committee and the Board based upon the same record, this Court, on February 27, 1991, entered a rule upon Davis to

1. The Disciplinary Board initially remanded the matter back to the Hearing Committee to consider the question of laches arising from the time lapse between the alleged misconduct in 1982 and the filing of the Petitions for Discipline in 1987 and 1988. The Hearing Committee determined that laches was not an issue, and reasserted its recommendation that Davis be disbarred. The Board accepted this recommendation as to laches. I agree that the defense of laches is not applicable as Davis contributed to the delay and has not demonstrated the requisite prejudice arising from such delay. However, I note with some interest that ODC's contribution to the delay in this matter is rather ironic when viewed in light of its assertion that Davis' inattention to legal matters was sufficient to support a charge of neglect.

show cause why he should not be disbarred. On March 15, 1991, Davis requested oral argument pursuant to Pa.R.D.E. 208(e)(3), which this Court granted by order dated August 28, 1991. For the reasons that follow, I would discharge the rule to show cause and order Davis suspended from the practice of law effective May 21, 1986, for a period of time equal to that which he has already served.

The review of this Court in attorney discipline matters is *de novo*, and thus, this Court is not bound by the findings of either the Hearing Committee or the Board. *Office of Disciplinary Counsel v. Shorall,* 527 Pa. 413, 416, 592 A.2d 1285, 1287 (1991). With this standard in mind, I proceed with a review of the matter *sub judice.*

This is not the first time that Davis has been sanctioned for unethical behavior. In fact, Davis has been subjected to numerous disciplinary proceedings and sanctions. Although he has complied with all sanctions previously imposed, he has remained on suspension status since May 21, 1984. While I am not compelled to address the intricacies of those prior proceedings and sanctions, it is apparent that nearly all of his prior violations were directly related to poor practice management. At the heart of Davis' problems is his decision to build a practice based upon a high volume of "simple" divorces.

In 1980, the Pennsylvania Legislature reformed the Divorce Code [2] to allow divorces upon consent without fault of either party. This permitted attorneys to complete divorce actions without court appearances, and with substantially reduced costs to the client. Based upon this change in the law, Davis began a statewide newspaper campaign advertising low cost services in these "No–Fault" divorce situations.

In response to these advertisements, each week Davis was responding to several hundred inquires, and was accepting, on average, 90 to 130 new cases. All of these cases were filed in Allegheny County regardless of where the parties resided

2. Act of 1980, April 2, P.L. 63, No. 26, 23 P.S. § 101 et seq. The Divorce Code was officially codified by Act of 1990, Dec. 19, P.L. 1240, No. 206, 23 Pa.C.S. § 3101 et seq.

until court officials, in response to a backlog of non-resident divorce cases began strict enforcement of venue requirements. Thereafter, Davis began filing non-resident actions in Cameron County, which was the lowest cost forum welcoming non-resident actions. However, Cameron County stopped this practice sometime after April 23, 1982, when the Court Administrator of Pennsylvania, pursuant to instructions from this Court, issued a memorandum and directive to all President Judges requiring strict enforcement of Pa.R.C.P. 1920.2,[3] precluding divorce actions from being brought in counties where neither the plaintiff nor the defendant resided.

The record does not reveal precisely when Davis was notified by court officials of Cameron County that it would no longer be permissible to file divorces in Cameron County where neither party resided therein. However, it is clear that when Davis received such notice he had already undertaken representation of Mrs. Michelle H. Dietrich and Mrs. Deborah R. Westcott, and had intended to file their divorce actions in Cameron County, which offered the lowest costs. Davis notified both of these women that he would no longer be able to file their actions in Cameron County, and that the costs associated with their actions would be higher in the counties in which they or their husbands resided. It is the events that transpired thereafter in these two cases that resulted in the charges by ODC through its Petition for Discipline dated October 5, 1987 and docketed 74 DB 87.

In the Dietrich matter, ODC alleges that Davis counseled Mrs. Dietrich to use a fictitious address in order to reduce costs associated with her divorce action, and filed documents that falsely represented her county of residence, when he knew or it was obvious that the address was false. The facts support only one of these contentions.

After Davis notified Mrs. Dietrich that he would not be able to file her divorce in Cameron County, Mrs. Dietrich, in

3. Pa.R.C.P. 1920.2 in effect at the time of this memorandum and directive provided that a divorce action could be brought only in the county in which the plaintiff or the defendant resides. This rule was subsequently amended in 1989, and now provides that a divorce action may also be brought in a county upon which the parties have agreed.

seeking to have her divorce filed in the least costly county, informed Davis that her address in Montgomery County was a temporary school address and that her permanent address was in Philadelphia County. Based upon this information, Davis prepared and filed a verified complaint providing that Mrs. Dietrich resided in Philadelphia County. Thereafter, the Court of Common Pleas of Philadelphia County requested a sworn affidavit from Mrs. Dietrich providing the dates she resided in Philadelphia County. Davis prepared an affidavit using the Philadelphia address, which Mrs. Dietrich executed. In response to this affidavit, the court scheduled a hearing for the purpose of establishing the residence of the parties and the proper venue for the divorce action. Mrs. Dietrich appeared at this hearing alone in order to reduce costs. At the hearing, Mrs. Dietrich falsely testified under oath that she resided in Philadelphia County, but recanted her testimony when the court confronted her with a communication from the Department of Public Welfare that indicated that her permanent residence was in Montgomery County. The case was then transferred to Montgomery County.

ODC urges this Court to conclude that Davis conferred with Mrs. Dietrich regarding her situation, counseled her to lie regarding her permanent residence and knowingly filed a complaint and supporting affidavit referencing the fictitious address. In support of this position ODC offers a stipulation as to what Mrs. Dietrich's testimony would have been had she appeared at the hearing in this matter.[4] I find this stipulation incredible, as it was prepared upon the uncorroborated and unsworn allegations of a client who: expressly informed Davis that her permanent residence was in Philadelphia County; verified the address set forth in the complaint; and admits that while under oath, she misrepresented her place of residence to the Court of Common Pleas of Philadelphia County on two separate occasions. I choose to believe the testimony of Davis that at all times he believed that Mrs. Dietrich's

---

4. Through this document, Davis only stipulated as to how Mrs. Dietrich would testify if she appeared at the hearing. He did not stipulate that the testimony was truthful, and merely accepted the admission of the testimony without the right to cross-examine Mrs. Dietrich.

permanent residence was in Philadelphia County, and that he did not counsel her to utilize a fictitious address. Accordingly, I find insufficient evidence to conclude that Davis either counseled Mrs. Dietrich to utilize a fictitious address, or knew up until the time he filed the complaint that Mrs. Dietrich did not have a permanent residence in Philadelphia.

However, the record does reveal that Davis's contact with Mrs. Dietrich and the Court of Common Pleas of Philadelphia County after the filing of the complaint should have alerted him to a problem regarding her residence. Davis clearly ignored many warning signs: Mrs. Dietrich's goal of obtaining the least expensive divorce possible; her convenient story about a temporary college address once she learned that it was cheaper to file in Philadelphia County rather than Montgomery County; her desire to continue to receive mail at the Montgomery County address; and the questions being posed by the court concerning her residency. The combination of all of these signs should have prompted Davis to make further inquiry prior to filing the affidavit of residency and demonstrates insufficient attention to detail. While this failure was obviously exacerbated by the deluge of other obligations inherent in the high-volume practice Davis undertook, had he been more diligent, it would have been obvious to him that Mrs. Dietrich did not live in Philadelphia.

I am not convinced that his ignorance of these warning signs rises to the level of an intentional act, but once they appeared Davis should not have prepared the affidavit of residency until conducting an investigation. Therefore, I find that on these facts, Davis had an affirmative duty to act on that which should have been obvious. His failure to act under these circumstances amounts to a violation of Disciplinary Rule 7–102(A)(6) (participation in the creation or preservation of evidence when it is obvious that the evidence is false), and Disciplinary Rule 1–102(A)(6) (conduct that adversely reflects on his fitness to practice law).

In the Westcott case, ODC alleges that Davis similarly counseled Mrs. Westcott to use a fictitious address in order to reduce costs associated with her divorce action. It also alleg-

es that Davis neglected this matter. The facts do not support these contentions.

After Davis notified Mrs. Westcott that he would not be able to file her divorce action in Cameron County, a confusing sequence of events occurred, encompassing the termination and reinstatement of Davis as counsel, the refund and repayment of costs and fees, missing correspondence, and ultimately an inability to locate Mrs. Westcott's file.[5] Thereafter, Mrs. Westcott wrote Davis and provided him with a Bucks County address that he could use to file her divorce action. Davis prepared a complaint using the Bucks County address, which was never filed. Mrs. Westcott eventually terminated Davis' representation, and Davis refunded all monies paid by Mrs. Westcott. Davis handled the Westcott case for approximately six months.

Davis testified that he never believed that Mrs. Westcott resided in Bucks County and that he did not counsel her to provide the fictitious Bucks County address. He stated that he prepared the complaint using the Bucks County address, but that he did not file it because he was not convinced that her husband resided in Bucks County. I choose to believe Davis rather than Mrs. Westcott whose unsworn allegations were offered by ODC through the same stipulation discussed in connection with the Dietrich matter. In addition, I believe that Mrs. Westcott is responsible for much of the delay in this matter, and that Davis' poor management only compounded the problem.

I agree with the conclusion of the Board that Mrs. Westcott presents the picture of a difficult client. She terminated Davis as counsel and demanded a refund when she learned of the additional costs; subsequently reinstated Davis; provided Davis with a fictitious address; and ultimately terminated Davis again when he did not file the complaint because he was not convinced that her husband resided in Bucks County. As

---

5. These events are essentially irrelevant to the charges before this Court except to the extent that they provide reasons for the delay in this matter and further evidence of the complete inadequacy of Davis' office management system to handle his excessive case load.

further evidence of her own lack of diligence in pursuing a divorce, I note that as of the first hearing in 1988 she still had not obtained a divorce. However, Davis' conduct did not help alleviate the problems in this case.

Davis was inundated with hundreds of pieces of correspondence each day. His filing system was complicated, disorganized and sloppy. Many functions were performed automatically by secretarial staff, and resulted in delay, missing correspondence and files. Clearly, Davis should have kept abreast of the status of his representation of Mrs. Westcott, and been more diligent in investigating the residency question. However, while Davis' conduct demonstrates poor management of a law office and in some ways falls below the standard I believe should be maintained by members of the profession, I am not convinced that Davis counseled Mrs. Westcott to utilize a fictitious address or excessively neglected this matter.

ODC's second Petition for Discipline dated February 2, 1988, and docketed No. 12 DB 88, arises in connection with seven divorce actions filed in Lancaster County. ODC alleges that Davis intentionally failed to return entrusted funds and improperly commingled these funds with funds that were the sole property of his law firm.

At the time these actions were filed, Lancaster County required the payment of master's fees regardless of whether they were necessary. Once a divorce decree was issued in cases where a master was not required, the master's fees would be refunded upon praecipe by counsel. At the time the complained of conduct occurred, Davis was involved in many divorce actions in Lancaster county. When a Lancaster County divorce decree was issued, Davis would praecipe the court for the return of master's fees advanced. When the fees were returned, Davis would instruct a secretary to deposit the funds and prepare a check for the client. This system provided no procedure for ensuring that unused funds requested from Lancaster County were actually returned.

The record reveals that in the seven cases at issue, which represented approximately 10 to 25 percent of the active

Lancaster actions, Davis did praecipe for the return of the unnecessary master's fee advances. However, for one reason or another Lancaster County did not refund the fees, and Davis did not inquire as to the status of the fee refunds. Ultimately, once Davis learned of the problem, he immediately refunded these fees to his clients. Clearly, Davis did not attempt to cover-up or conceal the receipt of funds or seek to convert client funds to his own use. Thus, while Davis' conduct again leaves much to be desired, it simply does not support a finding that Davis sought to intentionally deprive his clients of these funds.

However, I would be remiss if I did not admonish Davis for depositing the master's fee refunds into a bank account containing law firm funds, as Davis is charged with knowledge of the requirements of the disciplinary rules. His actions clearly violated Disciplinary Rule 9–102(A) (preserving identity of funds and property of a client). While there is no excuse for such commingling of funds, I believe it is a manifestation of inexperience compounded by a high volume practice.

### Sanction

The practice of law requires enormous dedication and attention to detail. As Davis learned, simple legal matters are relatively rare, and become non-existent when one attempts to handle these "simple" matters in high volume. Thus, in a high volume setting, competent and ethical representation becomes nearly impossible by any practitioner, absent supreme business acumen. This is a gift that few possess, and unfortunately for Davis, one that he certainly did not possess at the time of the conduct that gave rise to the matter *sub judice.*

The charges against Davis occurred as a direct result of his time constraints and the inability of his office to efficiently and properly act upon the matters associated with the high volume of cases. Considering the enormous amount of responsibility that Davis undertook, his total lack of organizational business tools, and his unreasonable reliance upon support staff, Davis'

ability to act competently and ethically on behalf of his clients was doomed to fall short. However, I believe, as did the Board, that these failures do not warrant the severe sanction of disbarment, as they are not the type of conduct for which disbarment is appropriate.

ODC would have this Court believe that it is precluded from disregarding the findings of the Hearing Committee that Davis intentionally violated the disciplinary rules, as only the Hearing Committee can weigh the credibility of Davis. However, this Court is not bound by these findings. *Shorall, Id.* at 416, 592 A.2d at 1287. There is no credible evidence that Davis acted intentionally in any of these matters, and his actions did not result in the loss of any of his clients' funds or abilities to exercise their rights. Thus, I believe this Court is left only with a judgment concerning the by-products of a poorly managed law practice, which fall below the requisite standard of care.

Initially, I am somewhat concerned with Davis' lengthy disciplinary record. However, as Davis' shortcomings in the matter *sub judice* were the result of poor business management and not a conscious effort to violate the disciplinary rules, I conclude that Davis' conduct does not reflect negatively upon his honesty, integrity, knowledge of the law or fitness to practice law. It is the lack of these characteristics that may warrant the extreme sanction of disbarment in order to protect the public, maintain the integrity of the bar, and preserve our ability to police ourselves. *See Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 506 A.2d. 872 (1986). As I believe Davis possesses these characteristics, the extreme sanction of disbarment is not warranted.

Since May 21, 1984, Davis has not practiced law, and despite being subjected to the uncertainties associated with his ongoing suspension status, rather than attempt to continue his life in a new direction, he has nurtured his ties to the law. He has functioned as a manager in law practices in order to learn the skills necessary to provide effective attention to the needs of

clients. He has attended a wide variety of continuing legal education and office management courses, and has remained consistently positive in his devotion to the law.

Based upon the length of his prior suspensions,[6] Davis has been eligible to apply for readmission to the bar since May 21, 1986, and has forgone attempting readmission solely because of the pendency of the matter *sub judice*. Nearly six years have passed since Davis became eligible to apply for readmission. During his ongoing period of suspension, Davis has acted to correct his prior deficiencies and acquire an ability to properly manage a law practice. His actions exhibit resolve, character, and knowledge of the proper tools necessary to enable him to perform the art of practicing law as prescribed by the disciplinary rules. Considering the ethical violations that I have found, I believe that the suspension Davis has been serving since May 21, 1986 is sufficient to effectuate the purpose of the disciplinary process, and I find no reason to expose him to further negative consequences in excess of those that he has already suffered.

Therefore, I would discharge the rule to show cause entered upon Davis, and order Davis suspended from the practice of law effective May 21, 1986, for a period of time equal to that which he has already served.

---

6. Six-month suspension imposed at No. 25 DB 83 by order of this Court dated May 21, 1984; one-year consecutive suspension imposed at No. 56 DB 82 by order of this Court dated September 7, 1984; and six-month consecutive suspension imposed at No. 78 DB 82 by order of this Court dated February 28, 1985.