**In re Anonymous No. 98 D.B. 92**

Disciplinary Board Docket no. 98 D.B. 92.

WITHEREL, *Member,* July 7, 1994—

## I. HISTORY OF PROCEEDINGS

On October 2, 1992, the Office of Disciplinary Counsel filed a petition for discipline.

On October 19, 1992, [    ] filed respondent's answer to petition for discipline and entry of appearance for respondent's counsel.

The board referred the matter to Hearing Committee [    ], consisting of [    ], Esquire, Chairperson, [    ], Esquire, and [    ], Esquire, members.

A hearing was held on February 17, 1993. The Hearing Committee filed its report on December 27, 1993. The committee unanimously recommended dismissal of the complaint.

Petitioner filed a brief on exceptions on January 19, 1994 and requested oral argument. Respondent filed a brief opposing exceptions on February 9, 1994.

A panel of the board consisting of Michael J. Witherel, Esquire, Richard D. Gilardi, Esquire, and Gerald C. Paris, Esquire heard oral argument on March 2, 1994.

The board adjudicated the matter at its meeting on March 10, 1994.

## II. FINDINGS OF FACT

The board, upon review of the findings of Hearing Committee [    ] and the evidence before it, both exhibits and testimony, adopts the following findings of fact:

(1) Petitioner, whose principal office is located at Suite 400, Union Trust Building, 501 Grant Street, Pittsburgh, Pennsylvania, is invested, pursuant to Rule 207 of Pennsylvania Rules of Disciplinary Enforcement with power and the duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in Commonwealth of Pennsylvania and to prosecute all provisions of the aforesaid rules

(2) Respondent, [    ], Esquire, was born in 1950, and was admitted to practice law in the Commonwealth of Pennsylvania in 1976. His office is located at [    ].

### Charge I: The [A] Matter

(3) On or about May 27, 1989, [A] retained respondent to represent him in a protection from abuse proceeding brought by his wife. (Stip. no. 3.) In or about mid-July, 1989 first complainant retained respondent to represent him in divorce proceedings as well. (Stip. no. 4.)

(4) [A] delivered to respondent a check for $850. Part of these funds was originally intended for use in paying a divorce master. (Stip. nos. 10, 11.)

(5) Respondent deposited these funds in his general firm account, not the firm trust account designated for client funds. (Stip. no. 12.)

(6) Respondent did not hire a divorce master.

(7) [A] retained other counsel to handle the divorce matters. (N.T. p. 46.)

(8) Respondent did not return any portion of the $850 originally received; instead, respondent applied the whole sum toward fees owed him by [A]. (Stip. no. 18.)

(9) At no time during the period in which these funds were held in respondent's general account did the balance fall below $850. (Stip. no. 18.) Upon notification of the fee dispute, respondent placed $850 in escrow. (N.T. pp. 50-51.)

## Charge II: The [B] Matter

### The Unescrowed Check

(10) By letter dated January 14, 1991, respondent requested that Attorney [C], who acted as settlement agent for the sale of the estate's real estate, release $1,674, which funds were escrowed against payment of inheritance taxes. (Exh. R-E.)

(11) On January 16, 1991, respondent received a check from Attorney [C] for such amount. (N.T. p. 65.)

(12) Respondent's bookkeeper deposited the check in the general firm account, not the escrow account. (N.T. p. 66; Stip. no. 52.) At no time during the period in which the funds were so held did the account balance fall below the amount. (Stip. no. 52.)

(13) Respondent did not direct this course of action and remained wholly ignorant of it for some time. (N.T. pp. 67, 120-121.)

### The Acknowledgment

(14) Under cover of letter dated November 30, 1990, respondent forwarded to [B] a copy of a "revised Sched-

ule I" of a Pennsylvania Inheritance Tax Return. (Stip. no. 40.)

(15) Within a short period, [B] returned the form signed, but unacknowledged. (N.T. p. 79; Stip. nos. 41, 42.)

(16) Respondent and his notary public were both familiar with [B's] signature. (N.T. p. 80)

(17) Respondent called [B] and verified that [B] had reviewed the document and signed it. (N.T. p. 80.) Respondent had his notary public acknowledge [B's] execution of the document based on this telephone call and their respective knowledge of [B's] signature. (N.T. pp. 80-81.)

### The Delay in Filing the Inheritance Tax Return

(18) [B] did not want the inheritance tax return filed until the real estate was sold. The closing on the real estate was held in June 1990. (N.T. p. 77.)

(19) Respondent had to contact [B] numerous times to receive information necessary to filing the return. [B] is a resident of Michigan. It was not always possible to speak with [B] directly, resulting in a delay in receiving the information. (N.T. pp. 77, 84-85.)

(20) Some of the account numbers provided by [B] for the estate's certificates of deposit were wrong. (N.T. p. 77.)

(21) [B] found extra expenses to be deducted from the estate after the return had been sent to him the first time, necessitating a recomputation. (N.T. p. 78.)

(22) The return was filed late, and late penalties were assessed. (Stip. no. 46.)

## III. CONCLUSIONS OF LAW

The board concludes that the petitioner has not met its burden of persuasion by clear and convincing evidence and therefore finds no violations to either charge of the petition for discipline.

## IV. DISCUSSION

This proceeding grew out of two separate representations by the respondent. In the first, respondent agreed to represent [A] in a domestic relations case (the [A] matter). Petitioner charged that respondent commingled funds with regard to an $850 check representing, at least in part, respondent's fee for representation, and, petitioner contends, an advance on the cost of a possible hiring of a master in the divorce and equitable distribution phases of the case. It is undisputed that respondent deposited this check, in its entirety, into his general firm operating account.

The second representation concerned the estate of [D], in which respondent represented the personal representative of the estate, [B]. Petitioner charged respondent with neglect under Rule 1.3, Pa.R.P.C., for respondent's delay in filing the inheritance tax return of the estate. Petitioner also charged respondent with engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation under Rule 8.4(c), Pa.R.P.C., for having a notary public in his office acknowledge a signature not made in her presence. Finally, petitioner charged that respondent violated both Rule 1.15(a), commingling, and Rule 1.15(b), failing to notify client of the receipt of funds, for respondent's handling of funds set aside for the payment of tax from the sale of real estate for the [D] estate.

Petitioner argued throughout the process that the most important issue in both representations was the commingling charge under Rule 1.15(a). See *e.g.,* Tr. Or. Arg. p. 16. The board agrees with this assessment, and therefore most of the following opinion concerns the rule against commingling of client and attorney funds in Pennsylvania.

The question before the board is the meaning of Pa.R.P.C. 1.15(a). This rule provides:

"A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from lawyer's own property. Funds shall be kept in separate account maintained in the state where the lawyer's office is situated, or elsewhere with the consent of the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be preserved for a period of five years after termination of the representation."

In particular, the situation presented concerns the first two sentences of the rule and whether an exception exists as to advanced funds. While we order dismissal of the charges against respondent, we wish to underscore the importance of compliance with the conditions of this provision.

The board finds no convincing legal support for an exception. Instead, the board believes that, by forcing segregation of unearned fees and advanced costs, the rule more completely fulfills its role of protecting clients and third parties. Such an interpretation also fits most comfortably within the tradition of holding attorneys to a higher standard with regard to the handling of funds.

The reasons for holding attorneys to a standard above that imposed on other professions when considering

the escrow rule has been ably stated in *In re Wilson, infra* a New Jersey decision examining a case involving attorney commingling and misappropriation:

"Like many rules governing the behavior of lawyers, this one has its roots in the confidence and trust which clients place in their attorneys. Having sought his advice and relying on his expertise, the client entrusts the lawyer with the transaction including the handling of the client's funds.... [I]t is commonplace that the work of lawyers involves possession of their clients' funds. That possession ... is usually essential. Whatever the need may be for the lawyer's handling of clients' money, the client permits it because he trusts the lawyer.

"It is a trust built on centuries of honesty and faithfulness. Sometimes it is reinforced by personal knowledge of a particular lawyer's integrity or a firm's reputation. The underlying faith, however, is in the legal profession, the bar as an institution. No other explanation can account for clients' customary willingness to entrust their funds to relative strangers simply because they are lawyers." *In re Wilson,* 409 A.2d 1153, 1154-1155 (N.J. 1979).

The Rules of Professional Conduct are designed to reinforce that trust. As the preamble to the rules states, "[t]he profession has a responsibility to assure that its regulations are conceived in the public interest and not in furtherance of parochial or self-interested concerns of the bar." (Preamble, Pa.R.P.C.)

The increased protection to clients and the public, which the literal reading of Rule 1.15(a) provides, falls squarely within the tradition of Pennsylvania practice. In the leading case of *Office of Disciplinary Counsel v. Lewis,* 493 Pa. 519, 426 A.2d 1138 (1981) the Supreme Court said, in the context of an attorney who admitted to commingling and converting funds, among other vio-

lations, "[o]ur task in cases such as this is to protect the public and to preserve the public confidence in the legal profession and the judicial system." (citations omitted) *Id.* at 526, 426 A.2d at 1142. It is no coincidence that D.R. 9-102(A) fell under Canon 9 of the old Code of Professional Responsibility, "[a] lawyer should avoid even the appearance of impropriety." (Canon 9, Pa. C.P.R.) Commingling funds increases the possibility that a client may be financially harmed, and in any case, falls short of the care required of a professional fiduciary. See comment to Rule 1.15, Pa.R.P.C.

One area of continuing confusion in this area which the present case illustrates is that of what to do with court costs, filing fees, and the like which are advanced by the client in connection with the representation. In this case, during the [A] representation, the client advanced $850 to respondent, with the understanding that at least part of the money would be used for a divorce master's fee. (Stip. no. 11.)

Under the Code, D.R. 9-102(A) specifically excepted such costs. The safeguarding of client funds was governed by D.R. 9-102(A):

"All funds of clients paid to a lawyer or law firm, *other than advances for costs and expenses,* shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to lawyer or law firm shall be deposited therein *except as follows:*

*"(1) Funds reasonably sufficient to pay bank charges may be deposited therein.*

*"(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is*

*disputed by the client, in which event the disputed por-*
*tion shall not be withdrawn until the dispute is finally*
*resolved.*" D.R. 9-102(A), Pa.C.P.R. (emphasis added)
The highlighted portions show significant differences
in wording from the present rule, which came into effect
on April 1, 1988.

The Rules. of Professional Conduct make no such
exception. Respondent strenuously argued throughout
the process that the simple lack of the exception in
the language did not mean that the exception was abol-
ished. See respondent's brief at 3.

His argument had two main thrusts. First, arguing
from the drafting of the rule itself, he maintained that
the abolition of the exception, if explicitly intended,
should have been the subject of an explanatory note
or comment to the new rule; its lack merely signified
that the exception was so well known that no codification
of it was now necessary. Second, he argued that many
practitioners, who had begun practicing under the prior
Code of Professional Responsibility had developed hab-
its and procedures of handling such funds that were
in conformity with the exception, and a strict construc-
tion of Rule 1.15(a) would lay a trap for the unwary
older lawyer.

The respondent's points are well taken. While, as
set forth below, we agree with Disciplinary Counsel
that the position counsel sets forth is correct, we write
this opinion to put an end to the confusion which re-
spondent has convinced the board currently exists.

Respondent's preferred interpretation comes from
viewing the rule as only mandating the separation of
client funds from the lawyer's own funds. While a pri-
mary purpose of the rule is to protect clients, the wording
includes third parties, which should include courts and

parties ancillary to the representation, such as court reporters and expert witnesses.

A simple illustration may illuminate this point. When an attorney pays such costs as an expert witness fee, he is acting as his client's agent, who is in fact paying his or her own obligations through the lawyer. When, on the other hand, the lawyer purchases office supplies for his practice, he is paying as his own principal.

All practitioners should have been aware that as of April 1, 1988, their conduct had to conform to the new rules. See order, October 16, 1987, *In re Rules of Professional Conduct,* no. 412, Disciplinary Docket no. 2, Pennsylvania Supreme Court. Furthermore, the form each attorney must return to the Disciplinary Board to maintain registration specifically calls attention to the requirements of Rule 1.15, specifying that the applicant must verify that he or she is in compliance. See "Certification," 1994-95 Attorney's Annual Fee Form, Administrative Office of Pennsylvania Courts, The Supreme Court of Pennsylvania.

An important point to note is the culpability requirement for Rule 1.15(a). Each of its clauses uses the word "shall" with no qualifiers such as "knowingly" or "reasonably," words which qualify other important duties of attorneys. See Rule 1.7(a)(1), Pa.R.P.C. (lawyer may represent a client despite a potential conflict where the lawyer "reasonably believes" the first client will not be adversely affected), *and* Rule 3.3(a)(2) Pa.R.P.C. ("[a] lawyer shall not knowingly fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client."). Therefore, because the drafters did not include qualifiers in the language of Rule 1.15(a), and they did use such qualifiers elsewhere in the rules, the literal

language clearly suggests a strict approach to the requirements of this rule.

Further, the Supreme Court noted the lack of an intent requirement when construing the direct predecessor to Rule 1.15(a) in the Code of Professional Responsibility, D.R. 9-102 (A). The recent case of *Office of Disciplinary Counsel v. Davis* involved a charge of commingling funds in violation of that provision, among other violations, during the course of a series of representations in divorce cases. *Office of Disciplinary Counsel v. Davis,* 532 Pa. 22, 614 A.2d 1116 (1992) (involving conduct which occurred in or about 1982). While considering the portion of the charge concerning commingling, the Supreme Court said, "D.R. 9-102(A) contains no requirement of an intentional act, but rather provides for strict liability." (footnote omitted) *Id.* at 31, 614 A.2d at 1121. Given these clear indications, it seems incontrovertible that Rule 1.15(a) also provides for strict liability.

The better practice for this attorney to have followed in the [A] matter would have been for him to have requested two checks from the client. This practice would have allowed him to deposit the amounts in the correct accounts and reduced the possibility of mistake. Another practice, suggested by the Hearing Committee, is the practice of maintaining a separate costs account. (N.T. pp. 93, 96.) However, the board recognizes that the ideal is not always the practical course.

With regard to advanced fees included with costs, the total amount should be deposited in the escrow account, and the fees withdrawn as earned.[1] When

---

1. It must be noted that these considerations *do not* apply to situations involving flat fees for specific services; these are distinguishable from retainers to be applied against future fees and costs.

earned, the fees are now the lawyer's property and should be withdrawn to avoid a technical violation of Rule 1.15(a). When earned fees are combined with costs or advanced fees in one negotiable instrument, the attorney should divide the deposit to avoid commingling.

In short, where money belonging to an attorney is combined with fees not yet earned or with funds to be expended in the course of the representation, the attorney MAY NOT deposit the whole sum in either the general office account or an escrow account. To do so would be an automatic technical violation of the rule no matter which account is chosen. It is the attorney's responsibility under Rule 1.15(a) to insure that such funds are not commingled.

Applying this rule to the case at hand, we find that, while the evidence presented may show evidence of clerical error (the [B] matter) or attorney misunderstanding (the [A] matter), petitioner did not present evidence which established by clear and satisfactory proof a violation of Rule 1.15(a).

The check for $850 which is the source of the controversy in the [A] matter contained some part of respondent's fee. The Hearing Committee so assumed in its report, at 2. However, the evidence clearly established that at least part of the check was for the anticipated cost of a master. (N.T. p. 36; Stip. no. 11.) Respondent's testimony indicated that he was operating in conformity with D.R. 9-102(A), where costs could be deposited in

---

The problem we do not address is acceptance of a flat fee followed by termination of the representation before little or any work is actually performed by the attorney. However, all should be aware that such flat fee arrangements are governed by, and will be scrutinized under the standards set for all fees according to Rule 1.5(a), Pa.R.P.C.

the attorney's operating account.[2] Therefore, under the rule as construed in this opinion, the respondent committed a technical violation of Rule 1.15(a), Pa.R.P.C.

However, the board believes no purpose would be served in sanctioning this attorney; it appears no harm came to the clients involved, and the purpose of the disciplinary system is not simply to punish. *Office of Disciplinary Counsel v. Costigan,* 526 Pa. 16, 24, 584 A.2d 296, 300 (1990). Petitioner has presented no evidence that respondent is a danger to the public or that his actions have brought disrepute to the profession. Thus, despite technical violation of Rule 1.15(a) and stressing that this case is not precedent for the proposition that technical violations will not be sanctioned, the board dismisses this charge.

The commingling charge in the [B] matter came from respondent's request to Attorney [C] for the release of funds from a real estate settlement for the estate which Attorney [C] had handled as an agent. These funds were escrowed for the purpose of paying the estate taxes. When respondent received the check, he gave it to his bookkeeper to deposit. The bookkeeper reviewed the account for the estate and determined that fees to respondent were due and owing, and therefore she erroneously deposited the funds in the general firm account.

The Hearing Committee specifically found, see report at 5-6, and the board concurs, that respondent did not direct his bookkeeper, who was also his wife, to deposit these funds in the firm's business account, and that

---

2. Respondent testified that he operated financially according to the "way [he] was taught" (N.T. p. 41), and that his accounting system was designed by a firm familiar with law offices, and approved by his CPA. (N.T. p. 96.)

respondent remained unaware that she had done so. (N.T. pp. 67, 120-121.) When he became aware of the error, he notified the client. (N.T. p. 72.) At no time during the period in which the funds were in the business account was the account balance less than the amount of the funds. (Stip. no. 52.) The Hearing Committee also specifically found that respondent's general office procedures were satisfactory. (Report at 6.)

The question remains as to whether this violation may yet be charged to respondent through his responsibility under Rule 5.3(b) and 5.3(c), Pa.R.P.C.[3] Because there is no finding that respondent did not "make reasonable efforts" to ensure that escrow funds would remain separate from his own money when such funds were handled by the bookkeeper, to hold respondent liable for this clerical error would be contrary to the spirit of the rules. Cf. *In re Anonymous, No. 35 D.B. 85,* 41 D.&C.3d 461 (1986) (sloppy bookkeeping methods a significant mitigating factor in conversion case).

### Additional Allegations in the [B] Matter

In addition to the issue of violating Rule 1.15(a), there were additional violations charged by Disciplinary Counsel in the [B] matter. The petition for discipline set forth, in addition to a violation of R.P.C. 1.15(a),

---

3. Rule 5.3(b) reads as follows:

"(b) a lawyer having direct supervisory authority over the non-lawyer should make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and

"(c) the lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if:

"(1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved...."

discussed above, violations of R.P.C. 1.15(b) (failing to notify client of funds received, and failure to forward same), R.P.C. 1.3 (neglect), and R.P.C. 8.4(c) (engaging in conduct involving deceit or misrepresentation).

The charge of failing to give notice of funds received arose from respondent's request to Attorney [C] for the release of funds from a real estate settlement for the estate which Attorney [C] had handled as an agent, discussed above. The same considerations apply here and no violation of Rule 1.15(b) is found.

The charge of neglect under Rule 1.3 was found not proven by the Hearing Committee, and the board similarly concludes that the evidence is conflicting on that point. The failure to file the inheritance tax return for the estate is clear, but there is evidence before the board which suggests that such delay was equally due to the client's actions, and the fact the client resided in Michigan. (N.T. pp. 77-81.) Without "clear and convincing proof," this board will not find a violation. *Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 580, 506 A.2d 872, 875 (1986).

The allegation of conduct involving deceit or misrepresentation concerned the notarization of a Pennsylvania Inheritance Tax form (a "revised Schedule I") without the presence of the executing party. The Hearing Committee found no violation, and the board concurs, because respondent and his notary public complied with the provisions of the Uniform Acknowledgments Act, specifically section 5, 1941, July 24, P.L. 490, 29 P.S. §291.5. Because respondent contacted [B] by telephone and confirmed that [B] had reviewed the document and signed it, and respondent relayed this information to his notary public, she did "know or have satisfactory evidence that the person making the acknowledgment [was] the person described in and who executed the

instrument." *Id.* By complying with the law's require-
ments, no deceit or misrepresentation within the mean-
ing of Pa.R.P.C. 8.4(c) occurred.

### V. DETERMINATION

The Disciplinary Board of the Supreme Court of Penn-
sylvania has determined that the charges against the
respondent be dismissed.

Mr. Paris did not participate in the adjudication of
this matter.

### ORDER

And now, July 7, 1994, upon consideration of the
report and recommendation of Hearing Committee [    ]
filed on December 27, 1993; it is hereby ordered that
the charges against [respondent] docketed at no. 98
D.B. 92 be dismissed.

