In re Anonymous No. 50 D.B. 90

Disciplinary Docket no. 50 D.B. 90.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

SLOANE, *Member,* March 27, 1996—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

The Pennsylvania Supreme Court issued an order on April 20, 1990, suspending respondent from the practice of law pursuant to Rule 214(d), Pa.R.D.E. This order was issued on the basis of respondent's December 7, 1988 conviction in the Superior Court of New Jersey of conspiracy and theft by deception in violation of N.J.S.A. §§2C:5-2 and 2C:20-4. As a result of this conviction, respondent was sentenced to serve a seven year prison term. This sentence was modified after reconsideration by the court to a prison term of 364 days and three years of probation.

On October 23, 1992, Office of Disciplinary Counsel filed a petition for discipline against respondent on the basis of her conviction. Respondent filed an answer on December 2, 1993. On December 12, 1993, respondent filed a motion and request to hold a reinstatement hearing at the same time as the disciplinary hearing. Petitioner did not oppose this request. The Disciplinary Board denied the motion by order of December 17, 1993. Respondent filed her motion with the Supreme Court, which denied it by order of February 16, 1994.

A hearing on this matter was held on March 18, 1994, before Hearing Committee [ ] comprised of Chairperson [ ], Esquire, and Members [ ], Esquire, and [ ], Esquire. Respondent was represented by [ ], Esquire. Office of Disciplinary Counsel was

represented by [    ], Esquire. *The committee filed its report on May 15, 1995 and recommended a five year suspension retroactive to March 18, 1994, the date of the hearing.* Respondent filed a brief on exceptions and requested oral argument. Petitioner filed a brief opposing exceptions. Oral argument was heard on September 21, 1995 before a three member panel of the board.

This matter was adjudicated by the Disciplinary Board at the meeting of October 6, 1995.

## II. FINDINGS OF FACT

The board makes the following findings of fact:

(1) Petitioner, whose principal office is located at Suite 3710, One Oxford Centre, Pittsburgh, Pennsylvania, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and the duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

(2) Respondent, [    ], was admitted to the practice of law in the Commonwealth of Pennsylvania on or about October 18, 1982. Her last attorney registration address was located at [    ]. Her current mailing address is [    ]. Respondent is subject to the disciplinary jurisdiction of the Disciplinary Board of the Supreme Court.

(3) By order of the Supreme Court dated April 20, 1990, respondent was suspended from the practice of law pursuant to Enforcement Rule 214. (P-7.)

(4) Petitioner's exhibits P-1 through P-9 are true and correct copies of the respective original documents and are admitted into evidence without further foundation.

(5) Respondent's exhibits R-1 through R-40 are true and correct copies of the respective original documents and are admitted into evidence without further foundation.

(6) In or about May 1987, respondent was indicted by a grand jury in the Superior Court of New Jersey, law division-criminal, in the matter captioned *State of New Jersey v. [A], [B] and [respondent],* State Grand Jury no. [   ].

(7) On or about December 7, 1988, respondent was found guilty of Count One of the indictment charging conspiracy in violation of N.J.S.A. 2C:5-2 and Count Two of the indictment charging theft by deception in violation of N.J.S.A. 2C:20-4.

(8) On March 13, 1989, respondent was sentenced to serve a term of imprisonment of seven years on Count One and four years on Count Two, with the four year sentence merged with the sentence on Count One.

(9) Because of the unique circumstances of this case, both respondent and the State of New Jersey filed a joint application to modify respondent's sentence in June 1991. Respondent was re-sentenced to three years probation and a sentence of 364 days in the county jail.

(10) Respondent served 82 of those days, much of it in work release, and was released on parole. Respondent's probation terminated on June 30, 1994.

(11) Respondent was seriously victimized and brainwashed as a result of being a member of the cult, [C], and was under the influence and control of [A], the

leader of the cult, who was responsible for master-minding the commission of the offense charged in the underlying New Jersey indictment.

(12) Since her conviction, [respondent] has removed herself from this cult. She has also obtained significant medical treatment from a variety of specialists and medical practitioners in this field. Moreover, after her conviction, respondent fell in love with, and married, a very reputable New Jersey trial attorney, and has thoroughly changed her life for the better.

(13) Respondent's counsel entered an appearance on behalf of respondent on October 2, 1993, subsequent to the filing and service of the petition for discipline.

(14) Respondent has not been the subject of prior discipline.

(15) Respondent was born on October 11, 1951, one of four children. She was educated in Catholic schools from grammar to high school and through college. (N.T. 16.)

(16) Respondent graduated from [    ] College in [    ] with a B.A. in Sociology in 1973. (N.T. 16.) In 1974, she became involved with the cult, [C], which was under the direction and control of the leader, [A]. [A] was also a co-defendant in respondent's criminal trial. (N.T. 19, 28.)

(17) This was a vulnerable time for respondent as she was looking for direction in her life, including a job in her field. Her family had recently scattered to various parts of the United States, and significantly her closest sister tried to commit suicide which was a very traumatic event for her. (N.T. 17-18.)

(18) Shortly after the suicide attempt, respondent entered the group which at that time was viewed as an idealistic commune, interested in education, Eastern phi-

losophy and intellectual study. As time passed, [A] became a more powerful leader and much more in control of the group. He was a charismatic leader who deprived members of reading newspapers or listening to radios, and lectured for up to 12 hours at a time in sessions where members were required to attend. (N.T. 21.)

(19) [A] directed that the two main sources of employment for members of the group included either night guard jobs or maintenance cleaning jobs. (N.T. 24-25.) There was an explicit understanding that no more than three to four hours of sleep was required and anything more than that was considered damaging to a person's outlook on the world. (N.T. 25.)

(20) [A] utilized a brainwashing technique of reward and punishment to control respondent. The punishment was by isolation, both emotionally and physically from the members of the group as well as [A] himself. The punishment was akin to moral condemnation. It was like being condemned to a sin or excommunication. (N.T. 22.)

(21) While a member of this cult, and on a gradual basis, respondent lost the ability for independent control of her life and actions, (N.T. 23, 24), was not permitted to see her family, including her dying father, (N.T. 35), and was under the domination and control of the cult leader, [A]. (N.T. 23.)

(22) While a member of the cult, respondent attained a position of great responsibility within the cult. (N.T. 89.)

(23) While a member of the cult, and at the direction of [A], respondent attended and graduated from [    ] Law School in 1982. (N.T. 27.) She did not practice very much as a lawyer, and in fact never had a fee-paying case at the time. It was during respondent's first year

as a lawyer that some of the offensive behavior in question occurred. (N.T. 27.)

(24) The crimes for which respondent was convicted centered around a loan scheme for individuals to obtain loans that were supposed to be used to pay for college tuition; but instead, the money was turned over to [A]. (N.T. 26.)

(25) At the time of the commission of the criminal offenses, respondent thought that she was acting freely, and only presently as she looks back does she believe that she was under the control of [A]. (N.T. 28.)

(26) At the time of the commission of the underlying crimes, respondent knew that her conduct and the conduct of [A] were wrong, and tried to convince [A] that the conduct was illegal, to no avail. (N.T. 46.)

(27) Respondent engaged in criminal behavior, knowing it to be wrong, because she felt unable to stop it. (N.T. 47.)

(28) There are a number of former members of this cult, and others that have provided affidavits that specifically state that they realize that respondent was under the control of [A] and did not act with free will with regard to these offenses. (N.T. 29.) (See R-10, R-11, R-25, R-26, R-27, R-28, R-29, R-30 and R-37.)

(29) Respondent was in a dissociative state while she was a member of the cult, which was a causative factor of her criminal conduct. (N.T. 91.)

(30) After respondent's initial sentencing, bail was revoked. An appellate court reversed this decision and released respondent on condition that she be restricted to the State of New Jersey. As the cult was then living in [    ], it meant she could not rejoin the cult. (N.T. 29.)

(31) After being released on bail, respondent began a relationship with her present husband, New Jersey trial attorney, [D], Esquire.

(32) [D] was at that time trial attorney for co-defendant [A], but once a relationship began to form with respondent, he withdrew from the representation of [A]. (N.T. 32.)

(33) [D] owned an apartment on the New Jersey shore which was then vacant. He offered the use of the apartment to respondent. This was the first time in 14 years that respondent had lived alone and had done anything separate herself from the group as a whole. Thereafter, she began to spend more time with [D] and his two children and less time with members of the cult. Her perspective began to change. (N.T. 30.) Her relationship with [D] grew into an intimate one. (N.T. 30.) [D] began to see that her involvement with the cult was much more dangerous than she had revealed to him or that she understood herself. (N.T. 31.)

(34) [D] assisted in locating competent psychologists and therapists to assist respondent—among them, Dr. [E], Dr. [F] and Dr. [G]. (N.T. 32.)

(35) She began therapy which included twice weekly sessions that required her to drive one hour and a half each way for about two years. After the first eight months of therapy with Dr. [E], respondent met [H], a psychoanalyst with a master's degree in social work who specialized in assisting ex-cult members.

(36) After her conviction, but before her sentencing, respondent began to reestablish family ties; she had not had contact with her family in about 12 years. (N.T. 34.)

(37) While in therapy, respondent felt a sense of shame and humiliation about what she had done and expressed bewilderment about her behavior in the cult. (N.T. 92.)

(38) [I], a former member of [C], who left the cult about six years before respondent, assisted respondent in the difficult process of separating from the cult. (N.T. 36.)

(39) Testimony presented at the underlying trial and submitted before the Hearing Committee showed that respondent does not have a criminal personality and that her behavior was caused by the effect of thought reform. (Exhibit R-12.)

(40) During her rehabilitation period respondent worked for a women's group entitled "[J]" that assisted battered women. She pursued this work after a recognition that there was some similarity between one who was in a cult and one who has been in an abusive relationship. (N.T. 37-38.)

(41) In addition, respondent assisted [K] in breaking away from [C] and reintegrating into society in much the same way that [I] had assisted respondent. (N.T. 37-38.) [L], an attorney in New York, who works on a volunteer basis for an organization that tries to educate families and individuals about the dangers of cults, has written, thanking respondent for her work on behalf of [K]. (N.T. 39, R-26.)

(42) Upon respondent's release from prison, she decided to attend school and study nursing. She graduated from the [M] Nursing School on June 12, 1994. (See letter, dated March 6, 1995, from [     ], Esquire.)

(43) *Respondent has performed excellently while in nursing school, maintaining an A average, receiving last year the alumni award for her class as voted on*

*by the faculty. She received the [     ] Award on June 12, 1994, in recognition of her academic excellence, leadership and commitment to the nursing profession. She also received the [     ] Award as a student of the graduating class who demonstrated special aptitude. On July 28, 1994, respondent was licensed to practice as a nurse in the State of New Jersey. (N.T. 41, R-32, and letter dated March 6, 1995, from [N], Esquire.)*

(44) Respondent, after receiving the alumni award which included a monetary award and recognizing that others were in greater need than she, donated the funds anonymously for the use of someone else. (N.T. 42.)

(45) As a result of a nursing licensing board letter which indicated that respondent would not be able to sit for the nursing exam until she completed her probation and was reinstated in the practice of law, she sought to have the Disciplinary Board hearing joined with a hearing for reinstatement. (N.T. 42-43, R-40). Disciplinary Counsel did not object to this motion for consolidation. Respondent attended the necessary classes to assure compliance with the continuing legal education requirement, should that motion have been approved. That motion was denied initially by the chairman of the Disciplinary Board, and ultimately denied by the Supreme Court in a vote of 4 to 3. Respondent has also re-familiarized herself with the Rules of Professional Conduct for attorneys. (N.T. 44.)

(46) [D], an attorney since 1967, and a managing partner in the [     ] law firm of [O], a former member of the attorney general's office and a former prosecutor in [     ] County, New Jersey testified that: he observed that respondent was under the control and domination of [A] (N.T. 55-58); she had lost her free will to him (N.T. 59); he corroborated the fact that prior to the initial sentencing the respondent had a lack of contact

with the community outside of [C], and that respondent and other members of the cult were required to turn over property to [A], to work security jobs and night maintenance jobs and were subject to sleep deprivation. (N.T. 61.)

(47) He observed firsthand that when respondent went to the New Jersey shore to live, she automatically got a night job working and sleeping bizarre hours, in a downtrodden motel outside of Atlantic City; that she would nap and sleep on a dirty floor behind the desk near the entranceway. (N.T. 62.) He began to recognize that respondent had serious psychological problems. (N.T. 62.)

(48) [D] corroborated the intensive therapy to which respondent subjected herself and the painful results of the process. (N.T. 66-67.)

(49) [D], who is now husband to respondent, advises that he has lived with her every day for the past five years and she is a loving, kind, sensitive and honest woman. (N.T. 68.)

(50) It is [D's] opinion, without any reservation, that respondent is completely and totally rehabilitated and if he did not think that she was a good and decent person he would not have married her and subjected his children to living with her. (N.T. 68.)

(51) [P], an attorney who is a graduate of [    ] University in 1964, and a graduate of the [    ] Law School in 1967, past president of the [    ] County Trial Lawyers Association, past board member of the [    ], a chairman of the medical malpractice committee for [    ] in New Jersey (N.T. 72-73), a partner of [D's] (N.T. 73), described respondent as one of the most honest people he has ever known and a person of the highest integrity. (N.T. 74.)

(52) [P] testified that he has the highest regard for respondent's reputation for truthfulness and for her law-abiding nature. (N.T. 76.)

(53) [H] is a psychoanalyst with a master's degree in social work, having received a B.A. in 1968 from [    ] University and a master's degree in social work from [    ] University in 1970. She received certification as a psychoanalyst from the [Q], which is located in [    ], New Jersey, in 1984 and has been in private practice and working as a teacher at the [Q] since 1983. (N.T. 78.) Her specialty is the treatment of cult and former cult members. (N.T. 79.) She has written extensively in professional journals including a chapter entitled "[    ]," in a book entitled "[    ]," published by [    ] Press in 1993. (N.T. 79.)

(54) [H] has been leading a support group for former cultists continuously since 1978. She has had widespread experience with many different types of cults as well as experience with this particular cult group known as [C]. (N.T. 80.)

(55) She has treated two other individuals from [C] in addition to respondent. (N.T. 80.)

(56) [H] diagnosed respondent with a dissociative disorder as defined in the DSM—III R. (N.T. 81.) The specific dissociative disorder is one where the predominant feature is a dissociative symptom such as a disturbance or alteration in the normal functions of identity. [H] stressed the term "identity." (N.T. 82.)

(57) Prior to diagnosing the dissociative disorder, [H] carefully examined respondent's pre-cult personality, her cult personality and her post-cult personality.

(58) She concluded that respondent was a classic case of someone that had suffered from a dissociative disorder because her pre-cult personality had been very

idealistic, she had come from a large, religious Catholic family and thus had a very positive value system and a good sense of morality. (N.T. 84.)

According to [H], young people who are idealistic, as respondent was when she joined the cult, get involved in cults because they are not able to recognize a con, and they cannot believe a con even when they can recognize one. They just do not expect to be conned by a deceptive cult leader. (N.T. 84.)

(59) Many cult members, like respondent, enter cults in late adolescence or as young adults because this stage of life is filled with uncertainty. In respondent's case, [H] observed that respondent joined the cult when she was disconnected from her family and friends, in part, because they were scattered, and she was feeling separate and alone. (N.T. 85.)

(60) [H] observed further that people get involved in cults when they are suffering a loss or a trauma. Respondent joined this cult a month after finding out about her sister's suicide attempts, which were extremely alarming to her. In [H's] opinion, respondent used the cult as an escape from the upset which she was feeling as a result of those experiences. (N.T. 85.)

(61) According to [H], respondent was an ideal candidate for [A's] indoctrination. She was interested in education and [A] initially presented himself as an educator. She was told that she would be able to publish educational materials for him and that excited her. However, that was just a hook and she never published educational materials; instead she ended up working at security guard jobs. (N.T. 86.)

(62) Part of the process that induced this dissociative state involved isolating respondent from her family and friends and then bombarding her with constant lectures from [A] that lasted long periods of time. She suffered

from sleep deprivation, and became highly suggestible and very confused. She was away from her old ties so that there was no anchorage to the past; in this vacuum it became easy for her to shift to a new personality—the cult personality. (N.T. 87.)

(63) It is the unequivocal opinion of [H] that respondent entered a dissociative state while she was in [C], and this dissociative state was a causative factor of respondent's criminal conduct.

(64) [H] is clear that respondent has been rehabilitated and has fully recovered from the dissociative disorder. (N.T. 98.)

## III. CONCLUSIONS OF LAW

Respondent's conviction for theft by deception in violation of N.J.S.A. 2C:20-4 and conspiracy in violation of N.J.S.A. 2C:5-2 is a conviction under Rule 214(d), Pa.R.D.E.

Respondent's conviction constitutes a per se independent basis for discipline under Rule 203, Pa.R.D.E.

## IV. DISCUSSION

Rule 214(e), Pa.R.D.E., specifies that a certificate of conviction of an attorney for a serious crime provides a per se basis for discipline. The dispositive issue before the board at present is the extent of discipline warranted by the conviction. *Office of Disciplinary Counsel v. Costigan,* 526 Pa. 16, 584 A.2d 296 (1990).

The primary purpose of this Commonwealth's system of lawyer discipline is to protect the public from unfit attorneys and to maintain the integrity of the legal system. *Office of Disciplinary Counsel v. Stern,* 515 Pa. 68, 526 A.2d 1180 (1987). Disciplinary sanctions are not primarily designed for their punitive effects but

seek to determine the fitness of an officer of the court to continue in that capacity. *Office of Disciplinary Counsel v. Duffield,* 537 Pa. 485, 644 A.2d 1186 (1994).

When a disciplinary proceeding is based upon an attorney's conviction of a serious crime, the focal issue is whether the attorney's character, as shown by his or her conduct, makes the attorney unfit to practice law from the standpoint of protecting the public and the courts. *Office of Disciplinary Counsel v. Casety,* 511 Pa. 177, 181, 512 A.2d 607, 609 (1986), citing *Office of Disciplinary Counsel v. Campbell,* 463 Pa. 472, 345 A.2d 616 (1975). It is necessary to scrutinize the events surrounding respondent's criminal conviction in order to weigh the impact of the conviction upon the measure of discipline. It is also appropriate for the board to examine any aggravating or mitigating circumstances present in the matter set forth above. Respondent has now been suspended for approximately six years. It is obvious that respondent's deceptive and dishonest conduct warrants a significant suspension. The only significant issue is the retroactivity of that suspension.

Respondent was convicted of theft by deception and conspiracy for her part in a scheme whereby individuals from the [C] cult were directed to register at educational institutions for the purpose of obtaining guaranteed student loans. These loans were never used by the students for their college tuition but instead were given to the [C] cult.

Although it is reprehensible that an attorney is brought before the board for a criminal conviction, it is not mandatory that the attorney be disbarred. Pennsylvania does not utilize a per se disbarment rule for criminal conviction cases. Each case must be judged according to its own unique facts and circumstances. *Office of*

*Disciplinary Counsel v. Lucarini,* 504 Pa. 271, 472 A.2d 186 (1983).

Respondent presented evidence that she was extensively involved in the [C] cult for 15 years, during which time the incidents of misconduct arose. Respondent testified that she joined the cult shortly after college graduation and her sister's suicide attempt. Respondent believed she was joining an idealistic commune with a focus on Eastern philosophy and intellectual study. Instead, respondent was forced to sleep odd hours, work odd jobs at night, attend mandatory lectures by the group leader for up to 12 hours, and eradicate any familial contact. Respondent presented evidence in the form of expert testimony from [H], a certified psychoanalyst and respondent's therapist. [H] testified to her experience in treating former cult members. [H] testified that she diagnosed respondent with a dissociative disorder, which is a recognized disease listed on the DSM—III R. Respondent suffered from this disorder during her 15 year involvement with the cult. [H] further testified that respondent's misconduct was caused by her dissociative state. The existence of psychiatric problems can only be used to mitigate the severity of attorney misconduct. Psychiatric problems can never fully absolve the attorney of the misconduct. In order for a psychiatric infirmity to be considered in mitigation in a disciplinary proceeding, respondent must establish by clear and convincing evidence the existence of a causal connection between the disorder and the attorney misconduct. *Office of Disciplinary Counsel v. Braun,* 520 Pa. 157, 553 A.2d 894 (1989). After review of the record, the board finds that respondent has clearly met the burden of proof required by *Braun.* Although

most of the *Braun* cases we review involve drug or alcohol abuse, nevertheless, we have on numerous occasions considered psychiatric problems as within the ambit of *Braun,* if supported by expert testimony. Moreover, in today's contemporary society, unfortunately, there are people such as [A] that are able to actively control the minds of their victims as a group through brainwashing techniques. Therefore, based on the high quality of unequivocal expert testimony presented, the board will consider respondent's dissociative disorder as a mitigating factor when recommending the appropriate disciplinary sanction.

Respondent presented other mitigating factors for the board's consideration. She introduced into evidence more than 20 letters from family, friends, educators, and former cult members attesting to her fine character. Several character witnesses testified at the hearing to her honesty and integrity and the efforts she has made to move on with her life since removing herself from the [C]. Respondent testified on her own behalf and fully admitted her guilt and expressed remorse for her misconduct. (N.T. 47-50, 53.) Based on the totality of the circumstances of this case, *the board recommends a five year suspension, retroactive to April 20, 1990.*

It should be noted that the Hearing Committee recommended a five year suspension *retroactive to March 18, 1994, the date of the hearing.* While the board is in agreement with the committee that a five year suspension is appropriate, the issue of retroactivity must be addressed, as there exists no established rule as to the applicability of retroactive suspensions. Respondent contends that the suspension should be retroactive to April 20, 1990, the date of the temporary suspension. Respondent contends that the effect of a five year pro-

spective suspension from March 18, 1994 would be that *respondent would be suspended for approximately nine years,* since she was temporarily suspended in April 1990. Respondent believes that this would be a violation of Rule 204(a)(2), Pa.R.D.E., which provides for suspension not exceeding five years. This argument is erroneous, as the rule pertains to final discipline, and is not intended to include any period of temporary suspension. Respondent argues that the committee failed to fully consider the case law and customary practice which provides that suspensions may be applied retroactively to the date of the temporary suspension. Petitioner's response to this argument is that retroactive suspension is not a right but a privilege reserved to those who prove compelling mitigating circumstances. The committee made its recommendation based on respondent's egregious misconduct, respondent's lack of credibility and remorse, and her lack of independent judgment. While the board is very careful to give deference to committee findings on credibility of witnesses, *Office of Disciplinary Counsel v. Davis,* 532 Pa. 22, 614 A.2d 1116 (1992), in this case, after scrutiny of the record, the board can find no support for the committee's position. The committee perceived that respondent lacked independent judgment to be a lawyer. The committee cited as an example a series of questions posed by her counsel.

"Q. It's fair to say you never profited personally; is that correct?

"A. I never received any money from the—it was a loan fraud. I never received any money personally, no.

"Q. And there was no personal gain to you of any sort?

"A. No, absolutely not.

"Q. Would it be fair to say you did not act from greed in this matter?

"A. I did not.

"Q. Is it fair to say you acted solely or principally, if you will, at [A's] direction?

"A. The whole scheme of this fraud was orchestrated and directed by [A]. And my role in knowing about that and any involvement was under his direction and to his benefit." (N.T. 26.)

The committee focused on this last answer in the series as demonstrative of respondent's lack of ability to use independent judgment. This answer must be taken in context with the situation. The expert testimony of [H] established that respondent suffered from a mental disorder that made her extremely susceptible to the control and direction of the cult leader. This evidence points to the conclusion that this disorder rendered respondent incapable of exercising independent judgment at that time. However, the weight of the evidence demonstrates that since her removal from the [C], she has taken full charge of her life. She made the decision to enter nursing school and has excelled in that endeavor. Respondent is a strong influence in the lives of her husband, stepchildren, and friends. She assisted other former cult members in rehabilitating themselves and has worked as a counselor to battered women. Respondent set goals for herself and is admirably achieving them. [P], an attorney, testified that respondent would be the first person he would choose to work with him at a law firm, as her integrity is beyond reproach. The weight of the evidence indicates that since her removal from the cult respondent has regained her independent judgment and is capable of exercising independent judgment as a lawyer.

The committee found that respondent had "serious difficulty" saying she was remorseful for her conduct. The board's review of the record evinces no such difficulty. Respondent stated her contrition several times during the hearing. She testified that she was guilty of the charges and would never deny that. (N.T. 48.) Respondent stated that she has remorse for the involvement in a criminal act, which has had a very strong impact on her life, and she has repeatedly had to make amends for it. (N.T. 50.) At another point respondent says that she is "absolutely" remorseful and does not want to carry that part of her life forward. (N.T. 53.) In addition to respondent's testimony, [H] testified that respondent was filled with a sense of shame and humiliation about what she had done, she admitted her guilt and was very remorseful. (N.T. 92, 94.) The board notes that [H's] testimony was accepted by the committee as credible.

The committee found that the respondent's egregious misconduct undermined public confidence in the legal system and eroded the integrity of the legal system. The committee found that the only reason respondent became an attorney was to legally advise the cult for the purpose of stealing student loan funds. The committee would have disbarred respondent for these acts but for the credible mitigating evidence of respondent's dissociative disorder. Based on the totality of these findings, the committee did not make the suspension retroactive to the date of the temporary suspension, but only to the date of the hearing.

In determining the issue of retroactivity, the board reviewed prior cases containing similar facts. In the case of *In re Anonymous No. 74 D.B. 89,* 22 D.&C.4th 261 (1994), an attorney pleaded guilty in federal court to multiple counts of mail fraud, wire fraud, failure

to file and pay taxes, and transferring and concealing property of a bankruptcy estate. The attorney received a two year prison sentence and five years probation. At the disciplinary hearing, respondent offered expert testimony as to a personality disorder he suffered which caused him to engage in the misconduct. The board accepted this evidence as credible and considered it in mitigation. The board also considered the character witnesses who attested to the attorney's good character and reputation. *The attorney received a five year suspension retroactive to the date he was temporarily suspended.* In the case of *In re Anonymous No. 78 and 106 D.B. 88,* 18 D.&C.4th 256 (1991), an attorney was convicted of the federal crimes of unlawful travel in interstate commerce, income tax evasion, and conspiracy. The attorney presented evidence of his 20 year unblemished disciplinary record, his cooperation with Office of Disciplinary Counsel, and his acknowledgment of responsibility. The board accepted this evidence in mitigation and additionally noted that the attorney's actions did not harm any clients. *The attorney received a five year suspension retroactive to the date of the temporary suspension.*

In the case of *In re Anonymous No. 3 D.B. 89,* 18 D.&C.4th 490 (1993), an attorney was convicted of possession with intent to distribute cocaine. The attorney presented expert testimony of his alcoholism and related addiction diseases. The board accepted this evidence in mitigation, along with numerous favorable letters regarding the attorney's character. The attorney received a five year suspension retroactive to the date of his temporary suspension. In the case of *In re Anonymous No. 20 D.B. 81,* 35 D.&C.3d 202 (1985), an attorney was convicted of mail fraud. The attorney introduced evidence of his history of good conduct and his awareness of the seriousness of the matter leading to the

conviction. *The board recommended a four year suspension retroactive to the date of the temporary suspension* based on respondent's lack of prior discipline, his impressive record of community activity, and his contrition. The Supreme Court adopted this recommendation. In the case of *In re Anonymous No. 121 D.B. 88,* 5 D.&C.4th 289 (1989), *an attorney who pleaded guilty to obstructing justice was suspended for two years and three months retroactive to the date of his temporary suspension.* The board considered the attorney's remorse, community activity, and evidence of his good reputation in the community.

The above-cited cases are analogous to the instant case as the attorneys were all convicted of crimes and received *retroactive suspensions* due to the mitigating circumstances present. However, case law does exist wherein an attorney's suspension was not made retroactive. In the case of *In re Anonymous No. 92 D.B. 86 and 59 D.B. 87,* 5 D.&C.4th 225 (1989), an attorney was found to have engaged in numerous instances of misconduct. The attorney presented, and the board found credible, expert testimony that she suffered from a personality disorder. However, the board found that the disorder did not overcome the attorney's awareness of right and wrong. Additionally, the board found that the attorney was still suffering from the disorder. The Hearing Committee recommended a two year suspension retroactive to the date of the hearing, which was one year previous to the date the committee issued its report. This would have allowed the attorney to have served one year of her suspension, with one year remaining. The board rejected this recommendation as it found no compelling reasons to support the application of a retroactive suspension, based on the findings that she still suffered from a disease, and the disease did not prevent her from knowing that her conduct was

wrong. The instant case can be distinguished from the circumstances of *In re Anonymous No. 92 D.B. 86 and 59 D.B. 87, supra.* Respondent herein no longer suffers from the dissociative disorder and presented convincing mitigating factors and unequivocal *Braun* testimony that render the reasons for a retroactive suspension more compelling.

The review of the case law leads the board to the conclusion that the facts of the instant case warrant a five year suspension *retroactive to the date of the temporary suspension on April 20, 1990.* There are no compelling reasons to recommend a suspension prospective from the date of the hearing. Respondent presented mitigating evidence that she suffered a dissociative disorder from which she has recovered, she is now a person of good character, as attested to by numerous letters and witnesses, she has engaged in community activities, she has shown remorse and a willingness to move forward with her life. These factors justify a suspension retroactive to the date of respondent's temporary suspension which would mean that, in effect, respondent will have been suspended for approximately six years as of the date of this opinion and she will still have to apply for reinstatement. The length of suspension is appropriate under the unusual facts of this case, which undoubtedly has the dramatics of a made-for-television movie. We believe that the *Braun* standard has been clearly met and respondent is now in control of her life. No further suspension is warranted. She should now be permitted to apply for reinstatement.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania recommends that the respondent, [    ],

shall be suspended for a period of five years, retroactive to April 20, 1990.

The expenses incurred in the investigation and prosecution of this matter are to be paid by the respondent.

Board Members Paris and George did not participate in the October 6, 1995 adjudication.

### ORDER

And now, May 6, 1996, upon consideration of the report and recommendations of the Disciplinary Board dated March 27, 1996, it is hereby ordered that [respondent] be and she is suspended from the bar of this Commonwealth for a period of five years, retroactive to April 20, 1990, and she shall comply with all the provisions of Rule 217, Pa.R.D.E.

It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.