**In re Anonymous No. 62 D.B. 97**

2

Disciplinary Board Docket no. 62 D.B. 97.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

SCHULTZ, *Member,* March 17, 1999—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

Petitioner, Office of Disciplinary Counsel, filed a petition for discipline against respondent, [ ], on May 6, 1997. The petition charged respondent with multiple violations of the Rules of Professional Conduct for his failure to segregate client and third party funds from his own, his failure to notify clients and third parties of receipt of funds in which they had an interest, and his failure to maintain adequate records of fiduciary funds. He was also charged with failing to pursue his cases competently and misleading his clients about their matters.

Respondent filed an answer to the petition on June 30, 1997.

Disciplinary hearings were held on October 24, 1997 and January 14, 1998 before Hearing Committee [ ] comprised of Chair [ ], Esquire, and Members [ ], Esquire and [ ], Esquire. Respondent was represented by [ ], Esquire. Petitioner was represented by [ ], Esquire.

The Hearing Committee filed a report on July 9, 1998 and recommended a four-year suspension.

Respondent filed a brief on exceptions and requested oral argument before the board on September 1, 1998. Respondent contended that the Hearing Committee erred by not considering a period of probation with a practice monitor as an appropriate discipline.

Petitioner filed a brief opposing exceptions on September 21, 1998 and requested the board adopt the committee's findings and conclusions of law and recommend not less than a four-year period of suspension.

Oral argument was heard on November 16, 1998 before a three-member panel of the board consisting of Mark C. Schultz, Esquire, panel chair, Alfred Marroletti, Esquire and Robert N. C. Nix, III, Esquire.

This matter was adjudicated by the board at the meeting of November 18, 1998.

## FINDINGS OF FACT

The board makes the following findings of fact:

(1) Petitioner, whose principal office is located at Suite 3710, One Oxford Centre, Pittsburgh, Pennsylvania, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary

4

proceedings brought in accordance with the various provisions of the aforesaid rules.

(2) Respondent was born in 1930 and was admitted to practice law in the Commonwealth of Pennsylvania in 1958. His office is located at [    ]. Respondent is subject to the disciplinary jurisdiction of the Disciplinary Board of the Supreme Court.

## Charge I

(3) During a period commencing no later than 1992 and continuing through early 1996, respondent maintained only one bank account with respect to his practice of law, [A] bank account no. [    ], later no. [    ], captioned "[respondent] attorney-at-law."

(4) Exhibit P-1 is a spreadsheet which sets forth transactions in the attorney account for the period September 30, 1994 through August 31, 1995.

(5) On February 23, 1996, respondent opened [A] bank account no. [    ], captioned "[respondent] Esquire attorney escrow account."

(6) Exhibit P-2 is a spreadsheet which sets forth transactions in the escrow account for the period February 23, 1996 through August 19, 1997.

(7) During a period commencing no later than 1992 and continuing through mid-1996, respondent failed to comply with the Rules of Professional Conduct in transactions involving client and fiduciary funds, including but not limited to those matters detailed in sections I.A through I.G, II and III hereinbelow, in which he:

(a) advanced financial assistance to clients in connection with pending litigation;

(b) commingled fiduciary funds with his own in the attorney account and in the trust account;

(c) paid personal and business expenses from the attorney and trust accounts;

(d) did not maintain adequate records of fiduciary funds and transactions; and

(e) did not maintain in trust an adequate balance of funds to cover individual and cumulative fiduciary entrustments.

(8) Exhibit P-3 is a spreadsheet showing petitioner's analysis of respondent's individual and cumulative fiduciary entrustments and his attorney and escrow account balances for the periods included in exhibits P-1 and P-2.

(9) By letter request for statement of respondent's position, D.B.-7 letter, dated November 27, 1995, petitioner first brought to respondent's attention its concerns about his handling of the funds of [B], and requested that he provide records of his management of fiduciary funds in general. (Exhibit P-4.)

(a) By letters to respondent's counsel dated February 27 and March 12, 1996, and by D.B.-7 letter dated May 20, 1996, petitioner amplified its concerns about respondent's possible violations of Rules of Professional Conduct in his handling of fiduciary funds in the matters set forth in charges I.A through III and asked that respondent produce additional records. (Exhibits P-5, P-6, P-7.)

(b) In response to said correspondence, under cover of letters of February 14 and July 24, 1996 (exhibits P-8 and P-9) and on other occasions, respondent submitted to petitioner copies of statements of distribution and of handwritten client cost records in certain matters, as set forth below.

(c) In and after February 1996, respondent deposited personal funds into the escrow account and issued on that account checks for some of the payments which were due to clients and third parties, as set forth below and in exhibits P-2 and P-3.

## *Charge I.A: The [C] Matter*

(10) Respondent filed suits captioned *[C] v. [D], [E], [ ] [F], [ ] [F], [G] v. [F] and [H]* at [ ] C.C.P. [ ], a personal injury action; and *[C] v. [D]* at [ ] C.C.P. [ ], a first-party benefit action, arising from the same accident; the cases were consolidated for trial in January 1992. (Docket entries are exhibits P-10 and P-11, respectively.)

(11) In or about July 1992, respondent settled the claims against [D] for $1,500 and the claims against [F] for $5,500.

(12) [C] died on July 23, 1992; on August 14, 1992, letters testamentary in his estate were granted to [I].

(13) Respondent prepared a statement of distribution, which was executed in [I's] name on August 8, 1992, which lists settlement of $5,500; $400 costs and $2,800 counsel fee; and $3,800 due to the estate. (Exhibit P-12.)

(14) Respondent's costs in the two suits, according to his cost records, totaled $449.74. (Exhibits P-13A, P-13B.)

(15) By letter dated September 11, 1992, [J] Insurance Company transmitted to respondent its check dated September 3, 1992, in the amount of $5,500, payable to "[I], executrix of the estate of [C], and [respondent], her attorney," on account of the [F] claim. (Exhibits P-14, P-15.)

(16) On October 26, 1992, respondent deposited the [J] check into the attorney account. (Exhibit P-1.)

(17) On or about November 16, 1992, respondent issued a check on the attorney account in the amount of $2,300, payable to the estate. (Exhibit P-1.)

(18) In or about January 1993, [D] transmitted to respondent its check dated September 16, 1992, in the amount of $1,500, payable to "The estate of [C], deceased, which respondent deposited into the attorney account on January 8, 1993." (Exhibits P-1, P-16.)

(19) On November 21, 1994, respondent issued a check on the attorney account, in the amount of $1,500, payable to the estate. (Exhibit P-1.)

(20) On various occasions between the dates of deposit of the funds into the attorney account and disbursement to the estate, the balance in the account fell below the amount cumulatively due to the estate and to other clients and third parties (cumulative fiduciary entrustments). (Exhibit P-3.)

## Charge I.B: The [K] Matter

(21) In or about May 1991, [K] retained respondent to represent her in claims arising from an accident which took place on April 30, 1991.

(a) Respondent had not previously represented [K].

(b) Respondent did not set forth the basis or rate of his fee in the matter in writing at or within a reasonable time after commencing the representation.

(22) Respondent filed suit captioned *[K] v. City of [   ], [D]*, [   ] C.C.P. [   ]. (Docket entries are exhibit P-17.)

(23) On August 12, 1993, a report and award of arbitrators was entered for the defendant, plaintiff having failed to appear; respondent appealed that award and paid $278 in costs. (Exhibit P-17.)

(24) In April 1994, respondent settled the case for $16,000.

(25) As a result of the settlement of the case, $250 of the appeal costs were refunded to respondent. (Exhibit P-17.)

(26) [D] issued a check dated April 13, 1994, in the amount of $16,000, payable to [K] and respondent, which was transmitted to respondent at a later date, and which respondent deposited into the attorney account on or about October 18, 1994. (Exhibits P-1, P-18.)

(27) Respondent issued the following checks on the attorney account to [K] or on her behalf:

| Date | Amount | Payee |
|------|--------|-------|
| 10/31/94 | $2,500 | [K] |
| 11/14/94 | 185 | [L] Rehab. |
| 11/14/94 | 170 | [M] |
| 11/28/94 | 2,675 | [K] |
| Total | $5,530 | (Exhibit P-1.) |

(28) Respondent issued a statement of distribution which is signed in the name of [K] and dated November 28, 1994, which lists settlement of $16,000; payments due to five medical providers, including those above, totaling $3,625; $800 in costs; $6,400 counsel fee; and $5,175 due to client, with credit for $2,500 paid to date. (Exhibit P-19.)

(29) Respondent's costs, according to his cost record, totaled no more than $727, plus a $100 charge for a will which he did not prepare; no credit is given for the $250 appeal refund. (Exhibit P-20.)

(30) Respondent issued a check on the escrow account, dated May 10, 1996, in the amount of $2,500, payable to Dr. [N], one of [K's] providers. (Exhibit P-2.)

(31) In January 1997, [K] wrote to respondent to request that he reimburse her $770 for medical bills which she believed he did not pay, $250 for the refund of the appeal costs, and the $100 charge for the will. (Exhibit P-21.)

(32) On January 20, 1997, respondent met with [K], at which time he gave her the will and refunded $100 in cash for preparing it, for which he had her sign a receipt; he refused to refund the $770, stating that the money was owed to the Department of Public Welfare. (Exhibits P-22, P-23.)

(33) Respondent has not paid or resolved such a claim since that date or refunded the $770 balance to her.

(34) On various occasions between the date of deposit of [K's] funds and the present, the balances in respondent's attorney account fell below the amounts due to her or on her behalf, and the balances in both accounts

have fallen below the amount of cumulative fiduciary entrustments. (Exhibit P-3.)

### *Charge I.C: The [O] Matter*

(35) On August 2, 1991, [O] was injured when exiting a [D] bus.

(36) Shortly thereafter, she retained respondent to represent her in claims arising from the accident.

(37) Respondent filed suit captioned *[O] v. [D], [P] and [Q],* [   ] C.C.P. [   ]. (Docket entries are exhibit P-24.)

(38) Respondent and [O] did not appear for arbitration on July 31, 1992, as a result of which a report and award for defendant was entered. (Exhibit P-24.)

(39) Respondent filed an appeal of that award, for which he paid filing fees of $266. (Exhibit P-24.)

(40) In or about November 1992, [O's] case settled for $6,500.

(41) As a result of that settlement, $250 of the appeal costs were refunded to respondent. (Exhibit P-24.)

(42) [D] issued a check to respondent dated September 1, 1994, in the amount of $6,800, payable to [O] and respondent, which was transmitted to respondent at a later date. (Exhibit P-25.)

(43) Respondent and [O] endorsed the check, and he deposited it into the attorney account on January 12, 1995. (Exhibit P-1.)

(44) Respondent issued a distribution sheet, which was signed by [O] on January 12, 1995, and which shows the settlement amount as $6,500 and lists payments totaling $2,040 to five medical providers; counsel fee of $2,130 and costs of $200; and $2,130 to [O]. (Exhibit P-26.)

(45) Respondent's costs in the matter, according to his cost record, totaled $380.50, including costs of $266; no credit is given for the $250 appeal cost refund. (Exhibit P-27.)

(46) Respondent issued the following checks on the attorney account to [O] or on her behalf:

| Date | Amount | Payee |
|------|--------|-------|
| 1/12/95 | $2,130 | [O] |
| 2/22/95 | 150 | [R] Services |
| 2/22/95 | 200 | [O] |
| Total | $2,480 | (Exhibit P-1.) |

(47) Under cover of letters dated April 10, 1996, respondent transmitted to four of [O's] providers checks drawn on the escrow account, dated April 15, 1996 and numbered 107(a), 107(b), 107(c), and 107(d) respectively, totaling $1,890; each check was negotiated in July 1996. (Exhibits P-28A-28D, P-2.)

(48) On various occasions between the date of deposit of [O's] funds and the final disbursements on account of her case, the balances in the attorney and the escrow account fell below the amount of cumulative fiduciary entrustments. (Exhibit P-3.)

*Charge I.D: The [S] Matter*

(49) [S] was injured in an accident which took place on September 15, 1993.

(50) Shortly thereafter, [S] retained respondent to represent her in claims arising from the accident.

(51) Respondent did not set forth in writing the method of determination of the fee.

(52) Respondent filed suit captioned *[S] v. [T] Inc., [T] and [U] Inc.,* [　] C.C.P. [　]. (Docket entries are exhibit P-29.)

(53) In or about October 1994, respondent settled [S's] case for $11,500 .

(54) [V] Insurance Company Group issued a check dated November 10, 1994, in the amount of $11,500, payable to [S] and respondent, and transmitted it to respondent. (Exhibit P-30.)

(55) On November 29, 1994, [S's] son, [W], died as a result of an incident involving City of [  ] personnel.

(56) In early December 1994, [S] met with respondent, at which time respondent agreed to represent her in claims arising from [W's] death.

(57) On December 5, 1994, respondent filed suit captioned *[S] P/N/G, Admin. of Estate of [W], Dec'd v. City of [  ]* at [  ] C.C.P. [  ]. (Docket entries are exhibit P-31.)

(58) On December 7, 1994, respondent:

(a) obtained a grant of letters of administration to [S] in the estate of [W];

(b) deposited the [T] settlement check into the attorney account (exhibit P-1); and

(c) gave [S] $1,300, the proceeds of a check drawn on the attorney account, which he had cashed, as an "advance." (Exhibit P-32.)

(59) Respondent prepared a statement of distribution, which [S] executed on December 23, 1994, which lists settlement of $11,500; $3,250 to [S's] providers; $250 in costs and $4,000 as counsel fee; and $4,000, less an "advance" of $1,300, to [S]. (Exhibit P-33.)

(60) Respondent issued the following attorney account, to or for the benefit of [S]:

| Date | Amount | Payee |
| --- | --- | --- |
| 12/22/94 | $2,700 | [S] |
| 12/22/94 | 600 | [L] Rehab. |
| 2/24/95 | 292 | Dr. [X] |
| 2/24/95 | 300 | [Y] |
| Total | $3,892 | (Exhibit P-1.) |

(61) With respect to the claims arising from the death of [W]:

(a) the first state court action was removed to the United States District Court, [  ] District of Pennsylvania at no. [  ] (exhibit P-34);

(b) respondent filed a second and a third state court suit at [   ] C.C.P. [   ] and C.C.P. [   ] respectively (exhibits P-35, P-36);

(c) these state court suits were also removed to federal court at no. [   ] and no. [   ] respectively (exhibits P-37, P-38);

(d) the first two federal court suits were dismissed (exhibits P-34, P-37); and

(e) in February 1997, [S] retained other counsel in the remaining pending action.

(62) Respondent issued a check on the escrow account, dated June 15, 1996, in the amount of $900, payable to Dr. [Z], another of [S's] providers. (Exhibit P-2.)

(63) In support of his July 24, 1996 response to the allegations of the D.B.-7 relating to his representation of [S], respondent, through his counsel, provided as exhibits:

(a) a copy of the statement of distribution, which includes an unsigned and undated amendment captioned "second reduction of medical bills," showing total bills reduced to $2,092, and stating:

"Client will use the sum of $1,158 to reimburse [respondent], Esquire, for court and file costs in the case of *[S] v. City of [   ] [. . .];* a civil suit arising out of the death of [W] . . . ." (exhibit P-39);

(b) a copy of a bill from [AA] Associates, in the amount of $800, dated March 7, 1996, captioned "re: [W]," "for professional services rendered" (exhibit P-40); and

(c) cost records for two different cases detailing expenses incurred on or after November 22, 1995, in the amounts of $686.75 and $257 respectively. (Exhibits P-41A-P-41C.)

(64) As of July 24, 1996, the [AA] bill had not been paid, and it was not paid until September 1996.

(65) On various occasions between the date of deposit of [S's] funds and the present, the balances in the attorney and escrow accounts have fallen below the amounts of cumulative fiduciary entrustments. (Exhibit P-3.)

*Charge I.E: The [BB] Matter*

(66) On August 13, 1988, [BB] was injured when she fell after leaving a [D] bus.

(67) Shortly thereafter, [BB] retained respondent to represent her in claims arising from the accident.

(68) Respondent filed suit captioned *[BB] v. City of [ ] and [D]*, [ ] C.C.P. [ ]. (Docket entries are exhibit P-42.)

(69) In or about June 1995, respondent settled the case with the city for $30,000.

(70) On July 14, 1995, respondent deposited into the attorney account a check issued by the city, dated July 7, 1995, in the amount of $30,000, payable to [BB] and respondent. (Exhibit P-1.)

(71) On August 11, 1995, respondent issued a check on the attorney account, in the amount of $5,000, payable to [BB], annotated "advance payment on account of settlement." (Exhibit P-1.)

(72) Respondent told [BB] that the remaining settlement funds were payable to her providers, he would attempt to compromise the bills, he would eventually send her any remaining balance, and that she should not contact him.

(73) On March 29, 1996, respondent issued a check on the escrow account, payable to [BB], in the amount of $3,000, annotated "second payment on account of settlement." (Exhibit P-2.)

(74) By letter dated September 10, 1996, [BB] asked that respondent pay certain outstanding medical bills and

provide a full accounting of her settlement. (Exhibit P-43.)

(75) By letter dated September 18, 1996, [CC], Esquire, advised respondent that he represented [BB] and asked for an accounting and distribution of her remaining funds. (Exhibit P-44.)

(76) By letter dated September 19, 1996, respondent forwarded to Attorney [CC] a proposed statement of distribution and a handwritten itemization of costs; the statement showed a settlement of $30,000; payments to 12 providers, totaling $5,034; costs of $546 and $10,000 in counsel fee; and a balance due to [BB] of $6,420. (Exhibits P-46, P-47.)

(77) By letter dated September 24, 1996, Attorney [CC] advised respondent of his concerns with respect to the proposed statement of distribution. (Exhibit P-48.)

(78) Respondent issued the following checks on the escrow account to or on behalf of [BB]:

| Check Date | Amount | Payee | Date Cleared |
|---|---|---|---|
| 6/13/96 | $300 | Dr. [DD] | 7/01/96 |
| 6/21/96 | 817 | [EE] | 9/24/96 |
| 6/21/96 | 1,178 | [FF] | 9/30/96 |
| 6/21/96 | 116 | [GG] | 10/01/96 |
| 6/21/96 | 125 | [HH] | 10/02/96 |
| 6/10/96 | 800 | Dr. [JJ] | 10/04/96 |
| 9/30/96 | 6,420 | [BB] | 10/01/96 |
| 9/30/96 | 1,360 | [JJ] | 10/07/96 |
| 9/30/96 | 195 | [KK] | 10/07/96 |
| 2/10/97 | 120 | [LL] | 4/03/97 |
| Total | $11,431 | ($5,011 to providers) | |

(Exhibit P-2.)

(79) On various occasions between the date of deposit of [BB's] funds and October 7, 1996, the balance in the

attorney account fell below the amount due to or on behalf of [BB], and the balance in the escrow account fell below the amount of cumulative fiduciary entrustments. (Exhibit P-3.)

*Charge I.F: The [MM] and [NN] Matters*

(80) Respondent represented [NN] and [MM] in cases captioned *[NN] and [MM] v. [D]*, [   ] C.C.P. [   ] and *[NN] and [MM] v. [D]*, [   ] C.C.P. [   ], arising from the same accident. (Docket entries are exhibits P-49 and P-50.)

(81) [D] issued a check dated October 22, 1994, payable to [MM] and respondent, in the amount of $6,000, which was transmitted to respondent at a later date and deposited into the attorney account on March 1, 1995. (Exhibit P-1.)

(82) On or about March 1, 1995, respondent issued a check on the attorney account to [MM] in the amount of $3,050. (Exhibit P-1.)

(83) [D] issued a check payable to [NN] and respondent, in the amount of $4,000, which was transmitted to respondent at a later date and deposited into the attorney account on or about March 3, 1995. (Exhibit P-1.)

(84) In the [MM] claim, respondent issued a statement of distribution which listed settlement of $6,000; client's portion of file and court costs, $300; balance of fee for criminal matter, $250; balance due to client, $3,050. (Exhibit P-51.)

(85) Respondent's costs in the [MM] case, according to his cost record, totaled $213.50. (Exhibit P-52.)

(86) In the [NN] claim, respondent issued a statement of distribution which listed "client's portion of the file and court costs . . . $250"; and deducted $1,500 from the distribution for five "advanced payments" to client on

dates from February 1992 through October 1993, with a net due to client of $650. (Exhibit P-53.)

(87) Respondent's costs in the [NN] case, according to his cost record, totaled $295.93. (Exhibit P-54.)

*Charge I.G: The [OO] Matter*

(88) Respondent filed suit captioned *[OO] v. [PP] Insurance Company,* [ ] C.C.P. [ ]. (Docket entries are exhibit P-55.)

(89) Respondent also represented [OO] in two other personal injury actions, one of which was resolved. (Docket entries are exhibits P-56 and P-57.)

(90) A court order was entered on July 31, 1991 that each party pay half of the fees of the neutral arbitrator. (Exhibit P-55.)

(91) The case was settled for $9,000 in April 1995.

(92) On or about April 13, 1995, respondent deposited into the attorney account a check issued by [PP], dated March 15, 1995, payable to [OO] and respondent, in the amount of $9,000. (Exhibit P-1.)

(93) Respondent prepared a statement of distribution in which he showed a settlement of $9,000; charged costs of $280 in the [PP] case, plus $250 to each of two arbitrators and costs of $200 and $100 in each of two other cases; and listed a total of $1,600 in three advance payments to the client between April 9, 1990 and August 21, 1991. (Exhibit P-58.)

(94) Respondent's costs in the [PP] case, according to his cost record, total $242.65 after deduction of advances and arbitrators' fees; his costs in two other cases total $212.75 and $198.84 respectively. (Exhibits P-59, P-60A, P-60B.)

## Charge II: The [B] Matter

(95) In or about June 1991, [B] retained respondent to represent her in claims arising from injuries sustained at a property owned by the [QQ].

(96) Respondent entered into an oral fee agreement with [B], pursuant to which his fee was 40 percent of any recovery.

(a) Respondent had not previously represented [B].

(b) Respondent did not reduce his fee agreement with [B] to writing, at or within a reasonable time after commencing the representation.

(97) Respondent filed suit captioned *[B] v. [QQ]* at [   ] C.C.P. [   ]. (Docket entries are exhibit P-61.)

(a) The suit was dismissed in June 1992 by stipulation of the parties, after which a report and award of arbitrators was entered against plaintiff due to failure to appear. (Exhibits P-62, P-63.)

(b) Respondent appealed the report and award of arbitrators, after which he was permitted to refile the action; the appeal costs were returned to him. (Exhibit P-61.)

(c) Respondent filed a suit captioned *[B] v. [QQ], [Q] and [RR] Co.* at [   ] C.C.P. [   ]. (Docket entries are exhibit P-64.)

(98) In September 1994, the second suit was settled for $14,100.

(99) In or about January 1995, [QQ] transmitted to respondent a check dated January 6, 1995, payable to [B] and to respondent, in the amount of $14,100, which was endorsed by them and deposited into the attorney account on January 26, 1995. (Exhibit P-1.)

(100) At the time that [B] endorsed the check, respondent advised her that he could not release all of her funds until he negotiated compromises of her medical bills, which, according to him, totaled $18,299. (Exhibit P-65.)

(101) By letters dated January 26 and 30 and April 13 and 24, 1995, respondent wrote to several of [B's] providers to request that they compromise their bills. (Exhibits P-66A-P-66I.)

(102) Between October 1994 and July 1995, respondent made periodic payments to [B] and on her behalf by checks drawn on the attorney account and in cash, as follows:

| Date | Amount | Payee |
|------|--------|-------|
| 10/17/94 | $ 500 | [B] |
| 1/26/95 | 500 | [B] |
| 2/24/95 | 500 | [B] |
| 2/26/95 | 100 | Dr. [X] |
| 3/06/95 | 300 | Dr. [SS] |
| 3/15/95 | 70 | [Y] |
| 3/22/95 | 500 | cash to [B] |
| 4/13/95 | 2,000 | [B] |
| 5/28/95 | 500 | [B] |
| 6/23/95 | 500 | cash to [B] |
| 6/30/95 | 250 | [B] |
| 6/30/95 | 500 | cash to [B] |
| 7/24/95 | 600 | [B] |
| Total | $6,820 | ($470 to providers) |

(Exhibit P-1.)

(103) In or about August 1995, respondent prepared a statement of distribution reflecting settlement of $14,100; $1,205 file and court costs; $4,300 counsel fee; payments to seven providers totaling $2,870; and $5,725 to [B], with credit for the payments made, resulting in a $625 "overpayment." (Exhibit P-67.)

(104) At the time, respondent had not paid $2,400 still due to providers.

(105) After he received the D.B.-7 letters concerning [B's] complaint, respondent made the following additional payments to her providers:

| Check Date | Amount | Payee | Date Cleared |
| --- | --- | --- | --- |
| 1/31/96 | $ 400 | [ ] | (Dr. [TT]) |
| 1/12/97 | 1,000 | Dr. [Z] | 2/19/97 |
| 1/12/97 | 700 | [UU] | 2/07/97 |
| Total | $2,100 | | |

(Exhibits P-1, P-2.)

(106) Respondent did not pay one of the providers, [VV].

(107) On various occasions between the date of deposit of [B's] funds and the clearance of the final checks to providers, the balances in respondent's accounts fell below the total fiduciary entrustments. (Exhibit P-3.)

(108) Respondent has, by his conduct as set forth above, violated R.P.C. 1.15(a).

*Charge III: The [WW] Matter*

(109) On or about March 16, 1988, [WW], a minor, was injured after he exited a [   ] public school bus driven by [XX] and was struck by a motorcycle driven by [YY].

(110) Shortly after the accident, [ZZ], [WW's] father, retained respondent to represent [WW] in claims arising from the accident.

(111) Respondent filed suits captioned *[WW] v. [YY]*, at [   ] C.C.P. [   ] and [   ] C.C.P. [   ], raising claims arising from the same accident. (Docket entries are exhibits P-68 and P-69.)

(112) Mr. and Mrs. [YY] were represented in the litigation by [AAA], Esquire; the school district and [XX] were represented by [BBB], Esquire.

(113) In or about June 1994, counsel agreed to settle the case for $2,500 from the school district and $15,000 from the [YY] insurer.

(114) Thereafter, counsel for defendants and a representative of the court contacted respondent on numerous occasions to request that he take necessary action to close out the case.

(a) By letter dated June 9, 1994, Attorney [BBB] advised respondent that she had $2,500 settlement authority, forwarded a release, and stated that upon receipt of the executed release, the minor's compromise, and the order to settle, discontinue and end, (the settlement documents), she would forward a draft. (Exhibit P-70.)

(b) By letter dated June 21, 1994, Attorney [AAA] forwarded to respondent a release, reminded respondent to proceed with a minor's compromise, and asked that respondent send him the settlement documents. (Exhibit P-71.)

(c) By letter dated July 6, 1994, [CCC], Esquire, judge pro tem in the case, confirmed the settlement and reminded counsel of the necessity to promptly complete the settlement documents. (Exhibit P-72.)

(d) By letters dated August 23 and November 15, 1994, and January 23, 1995, Attorney [AAA] reminded respondent to provide the settlement documents and advised him that he had the settlement draft available. (Exhibits P-73, P-74, P-75.)

(e) By letter dated November 15, 1994, Attorney [BBB] again asked that respondent provide the settlement documents. (Exhibit P-76.)

(115) Respondent did not at that time obtain execution of the releases, file a petition for minor's compromise or respond to attorneys [AAA's] and [BBB's] letters.

(116) In or about January 1995:

(a) Respondent obtained an examination of [WW] by his physician, Dr. [DDD]. (Exhibit P-77.)

(b) Respondent contacted [ZZ] and requested that he and [WW] execute releases, which they did. (Exhibits P-78, P-79.)

(117) By letter dated January 30, 1995, respondent forwarded to attorneys [BBB] and [AAA] the executed releases. (Exhibits P-80, P-78, P-79.)

(118) Thereafter, and continuing through November 1995, respondent did not file the petition for minor's compromise.

(a) By letter dated May 8, 1995, Attorney [AAA] advised respondent that if the petition were not filed in 30 days, he would seek entry of a judgment of non pros. (Exhibit P-81.)

(b) By letter dated May 8, 1995, Attorney [BBB] stated that she would send a release to replace one which was incorrectly executed and reminded respondent to file the petition. (Exhibit P-82.)

(c) By letter dated August 1, 1995, Attorney [BBB] advised respondent that if he did not supply the documents within 10 days, she would file a motion to compel settlement. (Exhibit P-83.)

(119) On August 4, 1995, [ZZ] and [WW] executed affidavits of consent to a petition for minor's compromise, and [ZZ] executed the second school district release. (Exhibits P-84, P-85, P-86.)

(120) At respondent's request, on November 30, 1995, [ZZ] and [WW] signed a verification which was not then attached to a pleading. (Exhibit P-87.)

(121) On December 1, 1995, respondent filed a petition to compromise minor's action, to which were attached the affidavits of consent signed by [ZZ] and

[WW]; the verification signed by [ZZ] in November 1995; respondent's certification, and a January 1995 letter from Dr. [DDD]. (Exhibit P-88.)

(a) In the petition, respondent alleged, inter alia, that his expenses as detailed therein totaled $592.

(b) According to respondent's cost records, his costs totaled $683.50, of which $266 was for an appeal of the first case. (Exhibits P-89, P-90.)

(122) By letter dated December 1, 1995, respondent forwarded to Attorneys [BBB] and [AAA] settlement documents including an undated and unfiled order to discontinue, and he requested that they forward the settlement drafts to him. (Exhibits P-91, P-92.)

(123) By letters to respondent dated December 4 and 21, 1995, Attorney [AAA] advised respondent that he had a new draft issued, which he promised to forward upon receipt of the executed order to discontinue and order approving the minor's compromise. (Exhibits P-93, P-94.)

(124) The order approving settlement and order for distribution was signed by the trial court on December 26, and by the orphans' court on December 29, 1995; the order provided, inter alia, that respondent was to purchase a savings certificate in the amount of $11,272 payable to the minor upon majority; and, within 30 days of the date of the order, to file proof of the establishment of the account. (Exhibit P-95.)

(125) By letter dated January 5, 1996, respondent forwarded to Attorneys [AAA] and [BBB] time-stamped copies of the order to discontinue and advised that the order for minor's compromise had been entered and transmitted to the orphans' court for approval. (Exhibits P-96, P-97.)

(126) By letter dated January 30, 1996, Attorney [AAA] forwarded to respondent a [EEE] Insurance Company check dated December 14, 1995, in the amount of $15,000, payable to "[WW], a minor and [ZZ], his parents [sic] and natural guardian and [respondent], their attorney," and advised respondent that the draft would become stale 60 days from issuance. (Exhibits P-98, P-99.)

(127) On February 2, 1996, respondent deposited the [EEE] Insurance Company check, which he had endorsed in the names of [WW] and [ZZ] and in his own name, into the attorney account. (Exhibits P-1, P-99.)

(128) By letter dated February 29, 1996, Attorney [BBB] forwarded to respondent a check in the amount of $2,500, payable to "[WW], a minor, & p/n/g [ZZ] and [respondent], Esquire." (Exhibits P-100, P-101.)

(129) On March 8, 1996, respondent deposited the school district check, which he had endorsed in the names of [WW] and [Z Z] and in his own name, into the escrow account. (Exhibit P-101.)

(130) By letters dated February 14, March 4 and March 12, 1996, [ZZ] asked that respondent advise of the status of the case and provide an accounting of funds. (Exhibits P-102f, P-103, P-103A, P-104.)

(131) On March 23, 1996, respondent met with [ZZ], and they purchased a certificate of deposit at [FFF], in the amount of $11,272, for the benefit of [WW], by check drawn on the escrow account. (Exhibit P-105.)

*Charge IV: The [GGG] Matter*

(132) On or about July 13, 1991, [GGG] (now [    ]), a resident of [    ], and [HHH], a resident of [    ], became ill after eating food purchased at [III] Sandwich Shop in [    ], which food contained ingredients supplied by [JJJ].

(133) In 1991, [HHH] retained respondent to represent her in claims arising from that incident.

(134) By letter dated October 29, 1991, respondent notified [KKK] Insurance Company, insurer of [JJJ], that he represented both [HHH] and [GGG]. (Exhibit P-106.)

(135) By letter dated April 22, 1992, [LLL], senior claims representative of [KKK], notified respondent that [KKK] would probably share responsibility for the claims with [MMM] Insurance Company, the carrier for [III], and requested that respondent forward medical and wage loss documentation. (Exhibit P-107.)

(136) On several occasions between 1991 and 1993, respondent contacted [GGG] to inquire whether she wished him to pursue claims on her behalf as well, but she did not retain him until February 1993.

(a) Respondent had not previously represented [GGG].

(b) Respondent failed to advise [GGG] in writing, at or within a reasonable time after commencing the representation, of the basis or rate of the fee.

(137) On July 9, 1993, respondent filed suit captioned *[GGG] v. [ ] and [ ] [III] t/a [III] Sandwich Shop and [JJJ]* at [ ] C.C.P. [ ]. (Docket entries are exhibit P-108.)

(a) On July 28, 1993, defendant [JJJ] filed preliminary objections, which were denied and dismissed on September 8, 1993. (Exhibit P-108.)

(b) On October 1, 1993, defendant [III] filed preliminary objections. (Exhibit P-108.)

(c) Respondent did not respond to the preliminary objections. (Exhibit P-108.)

(d) By order dated December 6, 1993, the action was dismissed, provided that if the plaintiff commenced a similar action in [ ] within 90 days, the defendants would submit to the jurisdiction of that court and not raise a statute of limitations defense. (Exhibit P-109.)

(138) By letter dated July 13, 1993, respondent had advised [GGG] that her trial was scheduled for January 10, 1994. (Exhibit P-110.)

(139) In or about December 1993 or January 1994, respondent advised [GGG] that the case had been dismissed in [   ], and it would not be necessary for her to appear for that arbitration proceeding, but that he would take appropriate action to proceed in [   ].

(140) Respondent did not file suit in [   ] or refer the case to [   ] counsel prior to February 6, 1994.

(141) Respondent did not communicate with [KKK] or with [NNN], acting for [MMM], again until October 19, 1994, when he wrote to the adjusters and asked that they contact him to negotiate settlement of the suit. (Exhibit P-111.)

(a) The adjusters did not respond to those letters.

(b) By letter dated January 3, 1995, respondent forwarded medical specials to the adjusters and again asked that they contact him to negotiate settlement of the suit. (Exhibit P-112.)

(c) Neither adjuster responded to those letters.

(142) In February 1995, respondent met with [GGG], at which time he provided her with certain documents and advised her that he was still waiting for a settlement offer.

(143) Commencing in or about April 1995 and continuing thereafter, [GGG] attempted to contact respondent by telephone and mail, including a certified letter dated August 10, 1995, to ask that he advise her of the status of her case. (Exhibit P-113.)

(144) Respondent again wrote to the adjusters on May 20, 1995; they did not respond. (Exhibit P-114.)

(145) Thereafter, respondent did not communicate further with the adjusters.

(146) By D.B.-7 letter dated December 29, 1995, respondent was notified of petitioner's concerns relating to the [GGG] case. (Exhibit P-115.)

(a) Respondent and/or his counsel answered that letter and a follow-up letter.

(b) By letter dated May 17, 1996, followed up by a telephone call of June 11, [GGG] advised respondent of her position with respect to his continued handling of the case. (Exhibit P-116).

(c) By letter dated June 12, 1996, respondent responded to [GGG's] letter and telephone call. (Exhibit P-117.)

(d) Thereafter, respondent did not communicate further with the adjusters.

(147) Of the several hundred claims arising from the food poisoning incident, [GGG's] was one of a few for which no payment was made by the insurance company.

(148) Respondent has, by his conduct as set forth above, violated R.P.C. 1.5(b) and R.P.C. 1.5(c).

*Charge V: The [OOO] Matter*

(149) In or about June 1991, [OOO] underwent a surgical procedure at [PPP].

(150) [OOO] was dissatisfied with the results of the procedure and believed that she had been the victim of medical malpractice.

(151) In or about August 1991, [OOO] retained respondent to represent her in prosecuting such a claim.

(a) Respondent had not previously represented [OOO].

(b) Respondent failed to reduce his fee agreement with [OOO] to writing, at or within a reasonable time after commencing the representation.

(152) On June 1, 1993, respondent filed suit by writ of summons captioned *[OOO] v. [PPP], Associates in*

*General Surgery P.A., Dr. [QQQ] and Dr. [RRR]* at [ ] C.C.P. [ ]. (Docket entries are exhibit P-118.)

(153) On June 29, August 18, and September 10, 1993, respectively, defendants [PPP], [RRR] and [QQQ] each filed a praecipe and rule to file a complaint within 20 days. (Exhibit P-118.)

(154) Respondent did not file a complaint within 20 days or at any time thereafter. (Exhibit P-118.)

(155) Respondent did not locate a medical expert to support [OOO's] malpractice claim.

(156) Respondent did not petition the court to withdraw from representation of [OOO] or to discontinue the action.

(157) On September 20, October 22, and October 26, 1993, respectively, judgments of non pros were entered in favor of defendants [PPP], [RRR] and [QQQ] for respondent's failure to file a complaint. (Exhibit P-118.)

(158) On numerous occasions between 1993 and 1996, [OOO] attempted to contact respondent by telephone and mail, including a certified letter sent in February 1996, to ascertain the status of the matter. (Exhibits P-119, P-119A.)

(159) Respondent's prior record of discipline includes:

(a) Informal admonition administered on July 11, 1991 for violations of Disciplinary Rules 6-101(A)(3), 7-101(A)(1) and (2), 7-101(A)(3), 1-102(A)(4) and 1-102(A)(6) in file [ ] and for violations of D.R. 6-101(A)(3), 7-101(A)(1), (2) and (3), and 7-101(A)(1), (2) and (3); and R.P.C. 1.1, 1.3, 3.2 and 8.4(d) in file [ ]. (Exhibits P-120A, P-120C.)

(b) Private reprimand administered on December 18, 1992 for violations of D.R. 1-102(A)(5) and 6-101(A)(1), (2) and (3); and R.P.C. 1.1, 1.3, 1.15(b) and 8.4(d) in file no. [ ]. (Exhibits P-121A, P-121B.)

(c) Informal admonition administered on September 29, 1993 for violations of R.P.C. 1.3, 1.4, 1.5(b) and 3.2 in file no. [    ]. (Exhibits P-122A, P-122B.)

(160) Respondent was named defendant in the following actions relating to his professional conduct, in each of which a judgment or settlement in favor of plaintiff was entered:

(a) *[SSS] v. [Respondent]*, [    ] C.C.P. [    ], settled 2/28/97 (docket entries are exhibit P-123; complaint answer and new matter, and answer to new matter are exhibits P-123A-P-123C respectively);

(b) *[TTT] v. [Respondent]*, [    ] C.C.P. [    ], settled 6/30/94 for $15,000; motion to enforce settlement 8/6/97 (docket entries are exhibit P-124; complaint, answer and new matter, and settlement agreement are exhibits P-124A-P-124C; payment record is exhibit P-124D);

(c) *[UUU] v. [Respondent]*, [    ] C.C.P. [    ], settled 3/15/94, award satisfied 4/19/96 (docket entries are exhibit P-125; complaint is exhibit P-125A; settlement order is exhibit P-125B); and

(d) *[VVV] v. [Respondent]*, [    ] C.C.P. [    ], settled 5/25/94, judgment satisfied 8/18/95. (Docket entries are exhibit P-1263; complaint is exhibit P-126A.)

## III. CONCLUSIONS OF LAW

By his conduct as set forth above, respondent violated the following Rules of Professional Conduct:

(1) R.P.C. 1.1—Failing to provide competent representation to clients;

(2) R.P.C. 1.3—Failing to act with reasonable diligence and promptness in representing clients;

(3) R.P.C. 1.4(a)—Failing to keep a client informed about the status of a matter and failing to promptly comply with reasonable requests for information;

(4) R.P.C. 1.4(b)—Failing to explain a matter to the extent necessary to permit a client to make informed decisions regarding the representation;

(5) R.P.C. 1.5(b)—Failing to communicate to clients, in writing, the basis or rate of an attorney's fee, before or within a reasonable time after commencing the representation;

(6) R.P.C. 1.5(c)—Failing to provide a written contingent fee agreement which states the method by which the fee is to be determined;

(7) R.P.C. 1.8(e)—Providing financial assistance to a client in connection with pending or contemplated litigation;

(8) R.P.C. 1.15(a)—Failing to hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property;

(9) R.P.C. 1.15(b)—Failing to promptly deliver to a client or third person any funds or other property that a client or a third person is entitled to receive and, failing to promptly render a full accounting regarding such property, upon request by a client or third person;

(10) R.P.C. 1.16(d)—Failing to take steps to the extent reasonably practicable to protect a client's interests upon termination of the representation;

(11) R.P.C. 3.1—A lawyer shall not bring or defend a proceeding or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous;

(12) R.P.C. 3.2—Failing to make reasonable efforts to expedite litigation consistent with the interests of a client;

(13) R.P.C. 8.4(b)—Committing a criminal act that reflects adversely on a lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(14) R.P.C. 8.4(c)—Engaging in conduct involving dishonesty, fraud, deceit or misrepresentation;

(15) R.P.C. 8.4(d)—Engaging in conduct that is prejudicial to the administration of justice.

## IV. DISCUSSION

This matter was initiated by petition for discipline filed against respondent on May 6, 1997. The petition alleges numerous violations of the Rules of Professional Conduct in cases involving 11 separate clients. The parties entered into a stipulation prior to the disciplinary hearing. Respondent admitted to certain violations of rules. In addition to the stipulation, the Hearing Committee heard testimony from respondent's former clients (as witnesses for petitioner), an investigator from Office of Disciplinary Counsel, respondent's secretary, respondent, and character witnesses for respondent.

Petitioner bears the burden of proving, by a preponderance of the evidence that is clear and satisfactory, that respondent's conduct violated the Rules of Professional Conduct. De novo review of the record by this board demonstrates that petitioner met its burden as to the violations charged in the petition for discipline.

The charges against respondent may be divided into financial issues and competence issues. Respondent is charged with violating a laundry list of rules pertaining to the entrustment of client funds and their use. The evidence of record demonstrates that respondent engaged in a pattern of financial impropriety, wherein he failed to notify clients and third parties of receipt of funds in which they had an interest; he used fiduciary funds for his own benefit; he commingled entrusted funds with his own; he failed to maintain sufficient funds in his account to cover fiduciary entrustments; he did not make prompt distribution

of funds; and he failed to maintain records of trust transactions. This misconduct began at the latest in 1992 and continued until early 1996.

The record shows that respondent has been practicing law since 1958 and has not had a trust account for at least 16 years. Instead, respondent maintained a single bank account through which he conducted personal, business, and fiduciary transactions. Respondent does not contest these facts. He ascribes his failure to maintain a trust account to the fact that his partner handled such matters and when the partnership dissolved, he was unaware of his ethical obligations relative to client funds. Respondent likens his situation to a college student managing his first checkbook. The reality of the situation is that respondent's partnership dissolved approximately 20 years ago. It is untenable that an attorney would have no awareness of his duty to have a trust account for such an extensive period of time.

Compounding this problem is the fact that respondent did not keep adequate records to ensure his clients received all monies to which they were entitled, and to ensure that he did not improperly use such monies for his personal benefit. Even if, as respondent claims, he did not know to keep an escrow account, at the very least he should have known to keep precise records of client funds in the account he did maintain. This failure to keep records resulted in clients receiving disbursements in a piecemeal fashion, rather than in a lump sum. The record is also clear that respondent paid himself his attorney fee immediately upon settlement, while expecting his clients to wait for their portion of the monies. For example, in the [C] matter, respondent immediately paid himself his fees, yet waited 22 months to distribute all settlement proceeds to his client. In the [BB] matter, it

took respondent 20 months to complete distribution of funds. The reason for the delay was that respondent's account was out of trust and he was unable to pay those individuals to whom he owed money.

In addition to respondent's failure to properly handle client monies, the evidence proves that respondent failed to communicate with his clients and performed services for his clients in a less than competent manner. In the [GGG] matter, respondent failed to respond to preliminary objections relative to the issue of jurisdiction. The preliminary objections were subsequently granted and, based on the court's order, respondent was to file suit in [  ] within 90 days. Respondent did not inform his client of this, nor did he file suit. Respondent then began to mislead [GGG] about the viability of her action and promised to settle the case by a date certain. Thereafter, respondent ignored his client's requests for information. This type of conduct is typical of the manner in which respondent handled cases.

Following the finding that respondent violated Rules of Professional Conduct, the board must now determine the appropriate discipline, giving due consideration to all facts of the misconduct, as well as aggravating and mitigating circumstances.

Respondent has a prior history of discipline consisting of two informal admonitions and one private reprimand imposed between 1991 and 1993. The misconduct in these matters started in approximately 1981. This was very shortly after respondent's partnership dissolved and he became a sole practitioner. The misconduct found in these cases is similar to that in the instant case. These encounters with the disciplinary system did not trigger any positive change in respondent's behavior and serve to contradict respondent's claim that his misconduct rep-

resents an occasional lapse of judgment. On the contrary, respondent has been violating the ethical rules of the legal profession since the inception of his time as a sole practitioner.

When determining an appropriate discipline, the board reviews the recommendations made by the Hearing Committee and the parties. The committee recommended a four-year period of suspension, which sanction, petitioner argued, is the minimum discipline appropriate in this case. The committee did not find respondent's explanation for his failure to maintain an escrow account credible. Further, the committee believed that respondent's actions pertaining to his mishandling of client monies were not simply a matter of oversight, as respondent suggested. In sum, the committee determined that respondent consistently violated the trust of his clients and placed his interests first, and felt that a four-year suspension ensures that the public will be protected from respondent.

Respondent suggests that a stayed suspension with a period of probation and a practice monitor is more appropriate to the situation. Respondent disputes the committee's finding that the violations stemmed from his dishonesty, rather than his fundamental misunderstanding of fiduciary responsibilities. Respondent points out that after he was put on notice of these problems, he established appropriate accounts and has since conducted his practice in accordance with his responsibilities.

Probation is governed by section 89.291 of the Disciplinary Board Rules. Pursuant to that rule, a respondent-attorney may be placed on probation if it can be demonstrated that he or she:

"(1) can perform legal services and the continued practice of law by respondent will not cause the courts or profession to fall into disrepute;

"(2) is unlikely to harm the public during the period of probation and the necessary conditions of probation can be adequately supervised; and

"(3) is not guilty of acts warranting disbarment."

Respondent believes he is a good candidate for probation because he is 68 years old and has been in practice for 40 years. He took measures to ensure that his misconduct will not occur in the future, he established that he is an individual of good character, and he cooperated with Disciplinary Counsel. He presented a witness at the hearing who is willing to serve as a monitor. Finally, respondent does not believe that his acts warrant disbarment.

Review of the facts indicates that respondent does not meet the criteria for probation. Although a legal practitioner for 40 years, respondent has not shown that he can practice law in a consistently competent and diligent manner. Respondent's age and the length of time he has been practicing do not serve as mitigating factors. His years of practice are punctuated by incidents of misconduct. Generally, in order for age and length of practice to serve as mitigating factors, the attorney must have a clean prior record. *In re Anonymous No. 32 D.B. 88,* 10 D.&C.4th 463 (1989). Respondent's conduct shows a pattern of client neglect and abuse of client trust. This neglect harmed his former clients and there is a strong likelihood of future harm if respondent is left to his own devices. Finally, respondent cannot overcome the last hurdle of demonstrating that his acts do not warrant disbarment. Respondent mishandled and misappropriated client funds. This act warrants disbarment. *Office of Disciplinary Counsel v. Monsour,* 549 Pa. 682, 701 A.2d 556 (1997); *Office of Disciplinary Counsel v. Lucarini,* 504 Pa. 271, 472 A.2d 186 (1983). Although not every

attorney who steals entrusted funds is disbarred, respondent has not established any grounds to distinguish his conduct from the conduct of respondents who were disbarred.

The magnitude of the misconduct in this case is disturbing. Respondent breached the trust imposed in him by 11 clients. The misconduct started at the latest in 1992 and continued until early 1996. At that time, respondent set up a trust account triggered by the investigation of Office of Disciplinary Counsel. Although respondent claims he now understands the concept of a trust account, this cannot assuage the damage done by his many years of ineptitude. In addition to respondent's fiscal malfeasance, he provided woefully inadequate professional services to his clients by failing to communicate and failing to diligently pursue client matters. The harm inflicted on respondent's clients is too grievous for him to be permitted to have contact with the public in the near future.

The serious nature and extent of respondent's unprofessional conduct justifies disbarment. Disbarment has been imposed in other cases similar to this one. *Office of Disciplinary Counsel v. Davis,* 532 Pa. 22, 614 A.2d 1116 (1992); *Office of Disciplinary Counsel v. Knepp,* 497 Pa. 396, 441 A.2d 1197 (1982). The attorneys therein were disbarred for engaging in patterns of serious client neglect. An attorney's admission by the Supreme Court of Pennsylvania to practice law in this Commonwealth is an endorsement to the public that he or she is worthy of confidence in professional relations. If that attorney becomes unworthy, that person must be removed from the profession in order to protect the public. The board recommends that respondent be disbarred, based on the totality of the facts and circumstances as set forth above.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania recommends that the respondent, [   ], be disbarred from the practice of law in the Commonwealth of Pennsylvania.

It is further recommended that the expenses incurred in the investigation and prosecution of this matter are to be paid by the respondent.

Board Member Elliott did not participate in the November 18, 1998 adjudication.

## ORDER

Upon consideration of the report and recommendations of the Disciplinary Board dated March 17, 1999, and following oral argument, it is hereby ordered that [respondent] be and he is suspended from the bar of this Commonwealth for a period of five years, and he shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.